667 P.2d 228

**In the Matter of the APPEAL IN MARICOPA COUNTY JUVENILE ACTION NO. A–25525.**

**No. 1 CA–JUV 189.**

Court of Appeals of Arizona, Division One, Department D.

June 21, 1983.

Rodney B. Lewis and Patrick Irvine, Sacaton, for appellant Gila River Indian Community.

Jennings, Strouss & Salmon by Rita A. Meiser and Jefferson L. Lankford, Phoenix, for appellee Catholic Social Service of Phoenix.

OPINION

MEYERSON, Judge.

The Gila River Indian Community (Community) appeals from a final order granting adoption. The facts which give rise to this appeal are as follows.

## I. FACTS

R.M., an anglo, met with a counselor from Catholic Social Service of Phoenix (Agency) on April 27, 1979, to discuss placing her soon-to-be-born child for adoption. She told the counselor that the father of the child was unknown because she had intimate relations with several men; she suspected that Edmund Jackson, a Pima Indian, and a member of the Community, might be the father. About three weeks later, R.M. gave birth to a baby girl. The baby had certain Indian features but no father was designated on the birth certificate.

The child was placed in a foster home and the Agency pursued the possibility that Edmund Jackson was the father. A social worker for the Community was contacted regarding the identity and whereabouts of Edmund Jackson. The social worker indicated that there were several Pima Indians with that name but he narrowed the possibilities down to one.

In July, Edmund Jackson telephoned the Agency in response to a letter which it sent him regarding the child. He later went to see the baby but he did not acknowledge or attempt to establish his paternity. In December, the Agency filed a petition for termination of parental rights. The petition named the natural father as "allegedly" Edmund Jackson and identified the child as of "Indian-American descent."

A petition to adopt the baby girl was filed in February, 1980. Based upon the Agency's "Report to the Court on Placement of Child," the trial judge sent a memorandum to the Agency stating that the Indian Child Welfare Act of 1978, 25 U.S. C.A. §§ 1901–23 (hereinafter ICWA or Act) clearly applied and requesting information regarding the requirements under the Act. In response, the Agency filed an addendum indicating that both the termination and adoptive placement proceedings were affected by the Act but because the alleged father had not acknowledged paternity the child was not eligible for membership in an Indian tribe. The addendum then listed several sections of the Act with which the Agency attempted to comply. The report pointed out that the Agency did not adhere to the statutory section regarding placement preferences (see Section II, *infra*) because it had "no proof that [the baby] had any tribal affiliation. . . . [and] the alleged father has not established paternity."

A termination order was filed several months later severing the rights of Edmund Jackson to the baby girl. The court found that the natural mother had consented to the adoption of the child and that the "natural father, Edmund Jackson" knew of the baby but failed to establish a parent-child relationship, that he had been served proper notice of the proceeding and that he had, in fact, abandoned the child. The court made no finding that the child was an "Indian child" within the terms of the ICWA.

More than a year later, in November, 1981, the Community moved to intervene in the adoption proceeding; the motion was granted. The trial court advised the Community that it should file a motion to intervene in the termination proceeding and in the adoption matter "file some pleading . . . relative to the acknowledgement or establishing paternity of Edmund Jackson as the father of the child . . . ." Shortly thereafter, the Community intervened in the termination proceeding but no further action was taken by the Community in the termination matter.

Concurrently, domestic problems arose between the husband and wife who sought to adopt the baby girl. Following their divorce, in January, 1982, the wife alone petitioned the court to adopt the baby. Six months later, the Community submitted a trial memorandum in which it contended that the Agency had not complied with the ICWA placement preferences. The memorandum asserted that the child was an "Indian child" but offered no proof of that fact. A month later, on August 17, 1982, an

affidavit acknowledging paternity was signed by Edmund Jackson and filed with the court six days later.

A final order of adoption was granted on September 15, 1982. In the court's minute entry of September 9, it found that to avoid "further insecurity and upset" to the child, the adoptive preferences under the Act would not be followed. The court concluded that the "best interests" of the child required her continued placement with the adoptive parent.

The Community contends on appeal that the Agency did not follow the ICWA regarding the original adoptive placement [1] of the baby, and that this failure was not excused by "good cause" because no such finding was ever made with regard to the original placement. The Community further contends that the remedy for the failure to adhere to the preference and notice provisions of the Act is to vacate the adoption order. On the other hand, the Agency contends that the issue is whether the trial court in the final adoption proceeding clearly abused its discretion in finding that the best interests of the child required that the preferences not be followed and whether the child now should remain permanently with the adoptive mother.

## II. INDIAN CHILD WELFARE ACT

The ICWA was enacted in 1978 to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families ...." 25 U.S.C.A. § 1902. Congress acknowledged in the Act that "an alarmingly high percentage of Indian families are broken up by the remov-

al ... of their children" and placement in non-Indian homes. *Id.* § 1901(4). The Act provides "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture ...." *Id.* § 1902.

There are two prerequisites to invoking the requirements of the ICWA. First, it must be determined that the proceeding is a "child custody proceeding" as defined by the Act. *Id.* § 1903(1).[2] Once it has been determined that the proceeding is a child custody proceeding, it must then be determined whether the child is an Indian child. *Id.* § 1903(4), (9).

Assuming that an Indian child is involved, the ICWA provides certain procedures to be followed for "voluntary" and "involuntary" proceedings. In an involuntary proceeding, the parties seeking a foster care placement or termination of parental rights, must notify the child's parent and the tribe by registered mail of the pending proceedings and of their right to intervene. *Id.* § 1912(a). No involuntary proceeding may be held until at least ten days after receipt of the notice by the parent or the tribe. *Id.* Additionally, the parent and the Indian child's tribe have the right to petition the court to invalidate any action for foster care placement or termination of parental rights upon a showing that such action violated certain other provisions of the Act. *Id.* § 1914. Voluntary proceedings are covered under 25 U.S.C.A. § 1913.

---

1. Although the Community objects to the "original adoptive placement" in 1979, the placement to which the Community refers was a foster care placement within the meaning of 25 U.S.C.A. § 1903(1)(i). The Community does not argue that the trial court failed to consider the ICWA's preferences in the final adoption order.

2. Child custody proceedings include:
   (i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have

the child returned upon demand, but where parental rights have not been terminated;
(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.
25 U.S.C.A. § 1903(1).

The Act also establishes "preferences" for the placement of Indian children. In a foster care or pre-adoptive placement, a preference is to be given to a member of the Indian child's extended family, a foster home approved by the Indian child's tribe, an Indian foster home, or an institution for children approved by the tribe. This preference is to be followed by the agency or court involved in the placement "in the absence of good cause to the contrary." *Id.* § 1915(b). The adoptive placement of an Indian child requires that a preference be given to the extended family of the Indian child, other members of the Indian child's tribe, or other Indian families, unless there is good cause to the contrary. *Id.* § 1915(a).

## III. DEFINING "INDIAN CHILD"

The ICWA requires an initial determination by the trial court that the child is an Indian child. *In re K.A.B.E.,* 325 N.W.2d 840, 842 (S.D.1982). The ICWA defines an Indian child as a child who is (1) a member of an Indian tribe or (2) a biological child of a member and eligible for membership in a tribe. 25 U.S.C.A. § 1903(4). Therefore, before we can decide whether the Agency failed to comply with the Act, we must first determine whether the Act applied.

■ The record of the proceedings leading up to the final adoption order reflects the newness of the ICWA. Indeed, the Act became effective only a few months prior to the birth of R.M.'s baby girl. No formal finding on the record was ever made that the child is an Indian child. In the termination matter, however, the court concluded that the Act applied to the mother and child because it noted that certain ICWA procedures had been followed. The trial judge hearing the adoption matter noted early in the proceeding—in a memorandum to the Agency—that the ICWA clearly applied.

The Community argues that these facts and the Agency's several attempts to comply with the Act justifies application of the ICWA and that proof on the record that the statutory criteria were met is not necessary. We do not agree. Before any section of the Act applies, it must be established on the record that the child meets one or both of the definitional criteria; only then does a parent or tribe qualify for "protection" under the ICWA. *Application of Angus,* 60 Or.App. 546, 655 P.2d 208, 210 (1982).

The proper course of action in the initial proceedings below would have been for the trial court to explicitly enter findings regarding the status of the child as an Indian or non-Indian [3] as early in the custody proceedings as possible. *See In re K.A.B.E.,* 325 N.W.2d at 842. The trial court should not have assumed throughout the proceedings below that the ICWA applied without ascertaining with proof and on the record that (1) the child is enrolled in a tribe [4] or that (2) the child is a biological child of an Indian who is a member of a tribe and that the child is eligible for membership in the tribe as well.

■ Absent a formal finding of fact that the baby was an Indian child, we must examine the evidence presented below. Edmund Jackson knew of the birth of the child in 1979. Frequent and repeated contact was made with him regarding the baby including notice of the termination proceeding. But he consistently declined to acknowledge a biological relationship with the child until August, 1982, three years after the child was born and thirty-one months after the adoption proceedings were initiated. We hold that in the case of a child born out of wedlock to a non-Indian mother, until such time as the putative Indian father acknowledges or establishes paternity,

**3.** This finding is not required, of course, in every child custody proceeding but only where the court has reason to believe that an Indian child may be involved. *See* 25 U.S.C.A. § 1912(a).

**4.** The best source of information on tribal membership is the tribe itself. The Bureau of Indian Affairs is the best secondary source.

Guidelines for State Courts; Indian Child Custody Proceedings. 44 Fed.Reg. 67584 (1979). The guidelines, published by the Bureau of Indian Affairs of the Department of Interior are a useful source of information for questions which might arise regarding the implementation of the Act.

the provisions of the ICWA are not applicable.

The Community argues that it was not necessary for the court or Agency to find a formal acknowledgment or the establishment of paternity to conclude that Edmund Jackson was the biological parent of the child. The Community contends that there was no serious doubt or dispute that Edmund Jackson was the father of R.M.'s baby girl. According to the Act, however, there must be more than mere speculation of paternity.

The ICWA defines "parent" as "any biological parent ... of an Indian child.... It does not include the unwed father where paternity has not been acknowledged or established ...." 25 U.S.C.A. § 1903(9). We think Congress has, by this language, evidenced its intent not to extend the ICWA to a child whose mother is non-Indian and whose father has failed to come forward and lay legal claim to the child.[5] This construction of the ICWA is in accord with the stated purpose of the Act—to protect Indian children from the destruction of Indian family units by child welfare agencies and courts. *See generally* H.Rep. No. 95–1386, 95th Cong., 2d Sess. *reprinted* in 1978 U.S.Code Cong. & Ad.News 7530.[6]

■ Thus, because there was no evidence to support a finding that the child is an Indian child, the ICWA was therefore inapplicable to the proceedings leading up to the final adoption. Consequently, the trial court was not required to send notice of the termination and foster care proceedings to the Community, nor was it required to follow the statutory preferences governing placement prior to August, 1982.

## IV. THE ADOPTION PROCEEDING

■ The Agency argues that the ICWA does not expressly authorize intervention by an Indian tribe in an adoption proceeding and it was therefore error for the trial court to admit the Community as an intervenor. Although the Act explicitly provides a tribe with the right to intervene in foster care and termination proceedings, 25 U.S.C.A. § 1911(c), it does not preclude a trial court from exercising its discretion in allowing intervention by a tribe in an adoption proceeding. Because the Act envisions that Indian tribes are to play a central role in custody proceedings involving Indian children, the trial judge acted within his discretion in granting the motion to intervene.

Having found that the Community was properly made an intervenor below, we turn to the Community's contentions regarding the final adoption order. First, as explained in Section III, *supra,* because Edmund Jackson did not acknowledge paternity until August, 1982, the Act did not apply until that date. Therefore, the Community is incorrect in arguing that the adoption order should be set aside because the Act's foster care preferences were not followed. The Community further contends that the trial court gave insufficient weight to the ICWA mandate that Indian children should be raised in Indian homes and further that it improperly weighed the relationship between the baby and the adoptive mother against the interests of the Community in preserving this child's ties to the Community.

■ An appellate court will not substitute its own opinion for that of the trial court, *In re Appeal In Pima County,* 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978), *cert. denied,* 439 U.S. 848, 99 S.Ct. 149, 58 L.Ed.2d 150 (1978), and findings of the trial court will be upheld unless they are unsupported by the evidence. *Id.* Also, it must

---

**5.** Our holding should be distinguished from that in *In re Baby Boy L.,* 231 Kan. 199, 643 P.2d 168 (1982) in which the court found the Act did not apply even where the Indian father acknowledged paternity.

**6.** Contrary to the Community's suggestion, the Act does not attempt to preserve a child's right to its Indian heritage under all circumstances.

Congress has specifically limited the Act's coverage to members of only those Indian tribes which qualify under the ICWA definition of "Indian tribe." 25 U.S.C.A. § 1903(8). Nor does the Act apply to a child of an Indian if the child is not a member of a tribe or not eligible for membership in a tribe. *Id.* § 1903(4).

be remembered that it is the child's best interests which are of primary concern in adoption proceedings. A.R.S. § 8–116. Similarly, the congressional declaration of policy behind the ICWA emphasizes that the first interest Congress seeks to protect is that of Indian children. 25 U.S.C.A. § 1902. It is patently clear that Congress envisioned situations in which the child's best interest may override a tribal or family interest—the preferences for placement are to be followed absent "good cause to the contrary." *Id.* § 1915(a), (b). Of course, the need to maintain an Indian child's ties to his or her tribe is not to be ignored where the ICWA is applicable. *In re Appeal in Pima County,* 130 Ariz. 202, 204, 635 P.2d 187, 189 (Ct.App.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

 Here, the trial court exercised its discretion in weighing the failure to comply with the Act once the paternity of the father was established and the tribal interest in the child against the fact that the baby girl had resided with the adoptive mother for three years; that a close mother-child relationship with the adoptive mother had been established; and that the baby's removal would cause psychological damage. These findings were supported by evidence and therefore the trial court did not abuse its discretion in ordering the adoption of the child. Under these circumstances, we find no abuse of discretion in the decision of the trial court declining to follow the preferences for adoptive placement.

The Community was a party to the termination proceedings but never presented evidence of the paternity of Edmund Jackson nor of the baby girl's membership in the Gila River Indian Community. The burden was on the Community to show that the trial court had improperly ordered termination. *In re J.B.,* 643 P.2d 306, 308 (Okl. 1982). Furthermore, the Community had an opportunity to prove the applicability of the ICWA in the adoption proceeding but failed to do so until the very late stages,

nine months after the Community first became a party.

The judgment of the trial court granting the final order of adoption is affirmed.

HAIRE, P.J., and EUBANK, J., concur.