**In the Interest of S.A.M., H.W., Appellant.**

**No. 13989.**

Missouri Court of Appeals, Southern District, Division One.

Jan. 22, 1986.

Linda F. Dycus, Kansas City, for appellant.

Betty A. Pace, Springfield, guardian ad litem.

FLANIGAN, Judge.

This is an appeal by the natural father from an order of the Juvenile Court of Christian County terminating his parental rights, § 211.447,[1] to S.A.M., an illegitimate female child who was born on July 16,

---

**1.** Unless otherwise indicated all references to    statutes are to RSMo 1978, V.A.M.S.

1976. Appellant is an Indian and an enrolled member of the Kickapoo Tribe of Kansas. The mother of the child is C.M., a non-Indian. This opinion will refer to the mother as "Carolyn," although that is not her name. The guardian ad litem of S.A.M. has filed a brief as respondent.

Appellant's sole contention is that the trial court erred in finding that the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901, et seq., ("the Act"), did not apply to the proceedings. For the reasons which follow, this court holds that appellant's contention, in light of the peculiar facts, has no merit.

There is no significant factual dispute. The termination proceeding was instituted on March 10, 1982, by the filing of a "petition to terminate parental rights" by a deputy juvenile officer. The petition alleged, among other things, the following: S.A.M. was in the custody of the Division of Family Services;[2] Carolyn was the natural mother; appellant was the natural father whose address was unknown to the juvenile officer; the court was requested to terminate the parental rights of Carolyn and appellant pursuant to § 211.447 for various reasons, including abandonment, neglect, nonsupport and noncommunication; S.A.M. had come under the jurisdiction of the juvenile court under the provisions of cited sections of Chapter 211; thereafter the custody of S.A.M. had not been with the parents for six months or longer and S.A.M. had been under the jurisdiction of the court for more than one year immediately prior to the filing of the petition; the termination of the parental rights of Carolyn and appellant was in the best interest of S.A.M.

Also on March 10, 1982, the juvenile officer filed an application seeking "service by publication" upon appellant because his address was unknown. The court issued an order of publication of notice and notice was thereafter published in a Christian County newspaper for four successive weeks commencing March 18, 1982.

Carolyn filed an answer to the petition and several evidentiary hearings were held. Carolyn attended those hearings in person and by counsel but there was no appearance by appellant.

On September 21, 1983, the court entered its order terminating the parental rights of Carolyn. On September 23, 1983, in the same proceeding, the court entered its separate order terminating the parental rights of appellant. On October 4, 1983, appellant filed a motion to set aside the order of September 23, 1983. That motion was sustained and the order of September 23, 1983, was vacated.

On October 21, 1983, appellant filed an answer to the petition to terminate parental rights. The answer pleaded, among other things, that Carolyn's parental rights were properly terminated; that appellant's parental rights should not be terminated; that appellant is a full-blooded Kickapoo Indian and an enrolled member of the Kickapoo Tribe of Kansas; that S.A.M. was eligible for membership in the Kickapoo Tribe and was "an Indian child" within the purview of the Act; that the court "was bound" by the Act, and that the Act controlled the proceedings. Also on October 21, 1983, appellant filed a "motion to modify" in which he sought custody of S.A.M. as her Indian parent.

On October 21, 1983, the Kickapoo Tribe of Kansas, through counsel, moved to intervene as a party. The motion recited, among other things, that S.A.M., "being the natural child of [appellant], is eligible for membership in the Kickapoo Tribe." On November 23, 1983, the Division of Family Services filed a motion to intervene. On November 30, 1983, the court sustained the respective motions to intervene of the Kickapoo Tribe of Kansas and the Division of Family Services.[3]

---

**2.** On November 19, 1980, the juvenile court entered an order placing S.A.M., and another child of Carolyn, in the custody of the Division of Family Services by reason of prior parental neglect.

**3.** Although the record does not show the ruling on appellant's motion to intervene, it is a rea-

On January 24, 1984, a hearing was commenced. Present were the following: appellant and his counsel, the deputy juvenile officer and his counsel, the guardian ad litem (who is a lawyer), the Kickapoo Tribe of Kansas by its counsel, and the Division of Family Services by its counsel. The hearing lasted three days, the last two days being January 27 and January 31. Appellant and his counsel, the juvenile officer and his counsel, and the guardian ad litem appeared at all three sessions but the attorneys for the Kickapoo Tribe and the Division of Family Services did not appear at the last two.

The lengthy transcript contains the testimony of many witnesses, including physicians, pediatricians, psychologists, case workers and laymen. The argument portion of appellant's brief makes no mention of the testimony of any witnesses.

Appellant testified that between October and December 1975 he had intercourse with Carolyn about 10 times. Appellant did not live with Carolyn but they were co-workers at the same plant. Appellant was not married to Carolyn and "there was no discussion of marriage.... The relationship was just what we were after—she was 'easy.' "

Appellant further testified that he was laid off at the plant and then came back to work in March 1976. "I saw Carolyn but we did not resume our relationship. I worked there until mid-April of 1976 and then left. I could tell Carolyn was pregnant. She was 'showing.' I did not discuss this pregnancy with her nor she with me. I did not ask her whose child it was. I thought Carolyn was probably three or four months along in her pregnancy and that would coincide with the time I had relations with her. At that time I did not feel a responsibility to determine if the child was mine."

Appellant testified that in February 1983, by accident, he saw a picture of S.A.M. and realized that the child was his. Prior to that time "I made no contact with

Carolyn and made no effort during those seven years to determine whether or not the child was mine. I did not pay any support nor offer any."

Appellant consulted an attorney in early 1983. In March 1983 appellant and his attorney were under the misapprehension that his parental rights had already been terminated and it was too late to appeal. In April 1983 appellant decided he wanted "to get his parental rights back." In mid-August 1983 appellant and his attorney found out his rights had not been terminated but they delayed intervening in the proceeding until Carolyn's rights had been terminated.

On cross-examination appellant testified that he knew that S.A.M. had severe emotional problems and needed psychiatric care and that he understood she was mentally handicapped.

The parties stipulated that appellant is an Indian and an enrolled member of the Kickapoo Tribe.

It is undisputed that S.A.M. was almost seven years old before appellant knew that S.A.M. even existed. S.A.M. has never been in the custody of appellant and indeed appellant has seen her only twice. Appellant first saw S.A.M. in September 1983 during a two-hour visit at a zoo. Also present on that occasion were S.A.M.'s foster parents. In January 1984 appellant had a second visit with S.A.M. at a zoo in St. Louis. Also present was the case worker of the Division of Family Services.

On September 10, 1984, the court entered its order terminating the parental rights of appellant and continuing the Division of Family Services' custody of the child, "until such time as an adoptive placement can be made."

The trial court made the following findings which appellant does not challenge: "[T]here are special circumstances which justify placing the child with other than the biological parents. ... S.A.M. is an ex-

sonable inference that the motion was sustained for appellant and his counsel participated fully

in all proceedings subsequent to its filing.

tremely emotionally disturbed youngster with multiple handicaps facing her. She has been placed with a family who has special skills in coping with her and in providing an unusually enriching and stable lifestyle for her. Each of the specialists who testified in open court or by deposition, with the exception of Dr. LeFevre, testified unequivocally that S.A.M. would regress if she were removed from her present home.... It is in the best interest of S.A.M. that she be permitted to stay in the home where she is presently located.... It is in the best interest of S.A.M. that the parental rights of [appellant] be terminated.... No support payments were ever made or offered by [appellant] even after he allegedly first learned of the child's existence in March 1983."

It should be observed that appellant makes no claim that the termination proceeding did not comply fully with the requirements of §§ 211.442 to 211.492. The trial court did find that S.A.M. was not "an Indian child," within the meaning of the Act, and the court also found that the Act did not apply to the proceeding. Appellant's challenge is to the propriety of those two findings.

■ In his argument appellant merely states that there was no compliance with the notice provision of § 1912(a) of the Act and that the trial court failed "to make a prior determination" of whether the child was an Indian child and thus had no jurisdiction to proceed. The fact is that appellant and the Kickapoo Tribe became parties to the proceedings well in advance of the hearing which commenced January 24, 1984. The time during which they had the opportunity to prepare for the hearing exceeded the time required by § 1912(a), set forth infra. It is also true that even if the trial court erred in its ruling that the Act did not apply, such an error did not divest the trial court of jurisdiction. *State ex rel. Juv. Dept. v. Charles*, 70 Or.App. 10, 688 P.2d 1354, 1360 (fn. 5), (1984).

Certain provisions of the Act must be mentioned.

"Indian" includes any person who is a member of an Indian tribe. § 1903(3). "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. § 1903(4). "Parent" includes any biological parent of an Indian child. It does not include the unwed father where paternity has not been acknowledged or established. § 1903(9). In any state court proceeding for the termination of parental rights to an Indian child, the Indian child's tribe shall have a right to intervene at any point in the proceedings. § 1911(c).

In any involuntary proceeding in a state court, where the court knows or has reason to know that an Indian child is involved, the party seeking termination of parental rights to an Indian child shall notify the parent and the Indian child's tribe, by registered mail, return receipt requested, of the pending proceeding and of their right of intervention. If the identity or location of the parent and the tribe cannot be determined, such notice shall be given to the Secretary of the Interior, in like manner, who shall have 15 days after receipt to provide the requisite notice to the parent and the tribe. No termination of parental rights proceeding shall be held until at least 10 days after receipt of notice by the parent and the tribe or the Secretary. The parent or the tribe shall, upon request, be granted up to 20 additional days to prepare for such proceeding. § 1912(a).

Once a parent has intervened, he or she is entitled to several additional rights: (1) to appointment of counsel if indigent, § 1912(b); (2) to examine all reports or other documents filed with the court upon which any decision with respect to termination of parental rights may be based, § 1912(c); (3) to have the court satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." § 1912(d).

Section 1912(f) reads: "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the *continued* custody of the child by the *parent* or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.)

Section 1914 reads, in pertinent part: "Any Indian child who is the subject of any action for ... termination of parental rights under State law, any *parent* or Indian custodian *from whose custody such child was removed,* and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of ... [25 U.S.C.S. §§ 1911, 1912, 1913]." (Emphasis added.)

Appellant, as the unwed father, is not included in the term "parent" if his paternity "has not been acknowledged or established." The Act does not set forth what is required to constitute acknowledgment or establishment of paternity.[4] Appellant argues that he "acknowledged" paternity by stating, in his "motion to modify" filed on October 21, 1983, that he did acknowledge paternity of S.A.M.

It should be observed that § 1912(f) requires, as a condition precedent to an order of termination of parental rights, a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, "that the *continued* custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

■ S.A.M. has never had an "Indian custodian" as that term is defined in § 1903(6). If it be assumed, arguendo, that appellant has acknowledged paternity and thus is a "parent," the instant facts would not support the determination required by § 1912(f) for the obvious reason that appel-

lant has never had custody of S.A.M., so it would be impossible for appellant's custody to "continue." It is arguable, under the instant facts, that Carolyn, the non-Indian mother, was not a "parent" within § 1912(f) for the reason that her status as a parent had previously been terminated. Even if Carolyn's relationship had not been terminated, or if her relationship as "biological parent" be deemed to survive that termination, there is authority that Carolyn would not qualify as "parent" within the meaning of § 1903(9). *Matter of Appeal in Maricopa County,* 136 Ariz. 528, 667 P.2d 228 (Ariz.App.1983).

In *Maricopa County* the court said, at p. 233:

"We think Congress has, by this language, [the definition of 'parent' in § 1903(9)], evidenced its intent not to extend [the Act] to a child whose mother is non-Indian and whose father has failed to come forward and lay legal claim to the child. This construction of [the Act] is in accord with the stated purpose of the Act—to protect Indian children from the destruction of Indian family units by child welfare agencies and courts. See generally H.Rep. No. 95–1386, 95th Cong., 2d Sess. reprinted in 1978 U.S. Code Cong. & Ad.News 7530.

Thus, because there was no evidence to support a finding that the child is an Indian child, [the Act] was therefore inapplicable to the proceedings leading up to the final adoption."

The holding in *Maricopa County* was that the non-Indian mother of an illegitimate child, who was reared in non-Indian surroundings, did not qualify as a "parent" within the meaning of the Act, nor did the father, who had failed to acknowledge his paternity. Even if it be assumed that appellant here has acknowledged his paternity, that fact should have no effect upon *Carolyn's* status as a "parent" or non-parent.

---

4. Cf. *State ex rel. T.A.B. v. Corrigan,* 600 S.W.2d 87 (Mo.App.1980), discussing what acts on the part of the father of an illegitimate child may constitute "acknowledg[ing] the child as his own by affirmatively asserting his paternity," as required by § 211.442.

Section 1912(d) of the Act requires a party seeking termination of parental rights to an Indian child under state law to satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. The Act does not define "Indian family." Under the instant facts the showing required by § 1912(d) could not be made based on any relationship between S.A.M. and appellant for their only contact with each other consisted of two short visits pending the litigation. That relationship is not sufficient to constitute a family relationship of the type whose breakup the Act seeks to prevent. The relationship between Carolyn and S.A.M., under the instant facts, does not constitute an "Indian family" of the type mentioned in § 1912(d). A Kansas case supports these views.

*In Matter of Adoption of Baby Boy L.,* 231 Kan. 199, 643 P.2d 168 (1982), based on facts somewhat similar to those at bar, the Supreme Court of Kansas held that the Act, by its own terms, did not apply to an adoption proceeding involving a non-Indian mother's illegitimate child, who had never been in the care or custody of the Indian father.

In *Baby Boy L.* the trial court entered a decree of adoption. The Indian father and the Kiowa Tribe appealed, contending that the trial court erred in determining that the Act did not apply to the proceeding. The child was born on January 29, 1981, and on that date his mother, an unmarried non-Indian woman, executed a consent to the adoption. Notice of the proceeding was given to the Indian father and the Kiowa Tribe. The tribe enrolled the child as a member of the tribe. The trial court found that the Act did not apply, concluded that the father was an unfit person to have the custody of the child, and granted the adoption.

Agreeing with the trial court that the Act was inapplicable, the Kansas Supreme Court said, at p. 175:

"A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother."

In support of its holding the court alluded to various sections of the Act. The court said, at p. 175:

"Section 1902 of the Act makes it clear that it is the declared policy of Congress that the Act is to adopt minimum federal standards 'for the removal of Indian children from their [Indian] families.' Numerous provisions of the Act support our conclusion that it was never the intent of Congress that the Act would apply to a factual situation such as is before the court.

Included in the congressional findings to support the Act is § 1901(4) to the effect 'that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them....' Section 1911(a) provides exclusive jurisdiction in the Indian tribe 'over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation....' Section 1912(d) provides that efforts should be made to prevent the breakup of the Indian family while subsections (e) and (f) refer to 'the continued custody of the child by the parent or Indian custodian' and the potential for emotional or physical damage to the child. Section 1914 again refers to the removal of the child from the parent or Indian custodian. Sections 1916(b), 1920 and 1922 also reflect the underlying thread that runs throughout the entire Act to the effect that the Act is con-

cerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family."

Finally at p. 175 the court said:

"[W]e are of the opinion that to apply the Act to a factual situation such as the one before us would be to violate the policy and intent of Congress rather than uphold them."

The court, in *Baby Boy L.*, conceded that the child was an "Indian child" within the definition of the Act, but the court concluded that the Act did not apply. It should be noted that the Indian father, in *Baby Boy L.*, filed an answer to the petition for adoption in which he asserted, and it was not disputed, that he was the father. The answer requested that he be given permanent custody of the child. Thus the father in *Baby Boy L.* took the same steps on which appellant relies for his claim that appellant had acknowledged or established paternity, within the meaning of § 1903(9).

This court agrees with the rationale of *Baby Boy L.* and holds that the trial court properly found that the Act did not apply to the termination of appellant's parental rights.

The judgment is affirmed.

TITUS, P.J., and GREENE, J., concur.