219 N.J. Super. 28 (1987)
529 A.2d 1009
IN THE MATTER OF THE ADOPTION OF A CHILD OF INDIAN HERITAGE.
Superior Court of New Jersey, Appellate Division.
Argued April 8, 1987.
Decided July 14, 1987.
*30 Before Judges KING, HAVEY and MUIR, Jr.
Brian J. Sexton argued the cause for appellant (Sterns, Herbert, Weinroth & Petrino, attorneys; Brian J. Sexton and Robert Santaloci, on the brief).
Margaret Goodzeit argued the cause for respondent (Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, attorneys; Paul A. Rowe, of counsel).
The opinion of the court was delivered by KING, P.J.A.D.
This is an appeal from a denial of an application to reopen a judgment of adoption and termination of parental rights on the grounds of fraud and misrepresentation under R. 4:50-1(c) and *31 denial of an application for intervention. R. 4:33. This case requires us to examine the Indian Child Welfare Act of 1978 (ICWA or the Act), 25 U.S.C.A. §§ 1901-1963. This comprehensive Act of Congress controls custody, adoption, and termination of parental rights of Indian children. Congressional authority over these proceedings was asserted pursuant to Article I, § 8, Clause 3 of the federal Constitution giving Congress plenary authority over Indian affairs: "The Congress shall have Power * * * to regulate Commerce * * * with Indian Tribes." See 25 U.S.C.A. § 1901.
In adopting the Act, Congress specifically found "that there is no resource more vital to the continued existence and integrity of Indian tribes than their children," 25 U.S.C.A. § 1901(3), and "that an alarmingly high percentage of Indian families are broken up by removal, often unwarranted, of their children by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C.A. § 1901(4). The Congressional findings concluded that state courts and agencies "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C.A. § 1901(5). The Act has been held constitutional under the Indian Powers Clause, the Tenth Amendment and the Due Process and Equal Protection Clauses of the Fifth Amendment. Matter of Guardianship of D.L.L. & C.L.L., 291 N.W.2d 278 (S.D. 1980).
Congressional policy was declared in 25 U.S.C.A. § 1902
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.
The legislative history of the Act reveals
Surveys of States with large Indian populations conducted by the Association on American Indian Affairs (AAIA) in 1969 and again in 1974 indicate that *32 approximately 25-35 percent of all Indian children are separated from their families and placed in foster homes, adoptive homes, or institutions. In some States the problem is getting worse: in Minnesota, one in every eight Indian children under 18 years of age is living in an adoptive home; and, in 1971-72, nearly one in every four Indian children under 1 year of age was adopted. [H.R.Rep. No. 1386, 9th Cong., 2nd sess. 9, reprinted in 1978 U.S. Code Cong. & Ad. News 7530, 7531 (House Report)].
The House Report also indicates that voluntary adoptions as well as involuntary termination of parental rights contribute to the problem. Id. at p. 11, 1978 Code Cong. & Adm. News at 7533. One commentator has noted: "Another economic factor accelerating the removal of Indian children has been growth in the private adoption market. In this era of birth control and abortions there has been a decreasing supply of healthy white children available for adoption. As a result, many parents seeking to adopt have sought Indian children instead." Barsh, "The Indian Child Welfare Act of 1978: A critical Analysis", 31 Hastings L. Rev. 1287, 1299 (1980).
Among other safeguards, the Act provides for appointment of compensated counsel for Indian parents and custodians, 25 U.S.C.A. § 1912(b), and remedial services and rehabilitation programs "designed to prevent the breakup of the Indian family." 25 U.S.C.A. § 1912(d). Proof beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" is required to terminate parental rights. 25 U.S.C.A. § 1912(f). Strong placement preferences in favor of the child's extended family, other members of the child's tribe, or other Indian families are mandated. 25 U.S.C.A. § 1915(a). Against this background we examine this appeal from a refusal to reopen this judgment of adoption and termination of parental rights. The basic question on this appeal is whether the Family Part judge clearly abused his discretion in refusing to reopen the judgment of adoption and permit relitigation of the issue.
*33 This is the procedural background. In early September 1984 Steven Sklar, former attorney for Terrence[1] and Melissa filed a complaint for the adoption of Baby Boy Larry, born on August 17, 1984, in the Family Part of the Chancery Division in Middlesex County. They gained custody of Larry when he was eight days old. On September 11 Judge Longhi entered an order granting Terrence and Melissa temporary custody of Larry, appointing Better Living Services to investigate and report on the proposed adoption pursuant to N.J.S.A. 9:3-48, setting a preliminary hearing date for November 16, and directing that the notice of the hearing be served on the unwed natural mother, Jane Doe[2], by regular and certified mail. The natural mother acknowledged receipt of the notice of hearing and reaffirmed her consent to adoption on October 1, 1984.
Sklar filed an amended complaint for adoption on October 15. The amended complaint for adoption stated that the natural mother claimed she did not know the identity of the natural father but that one Kenneth Wright had alleged that he was the natural father. The amended complaint recited that Wright had orally consented to the adoption but had not returned any consent forms.
On November 16 the judge entered an order terminating the parental rights of Doe, on the ground of consent, and of Wright, on the ground of relinquishment of his rights, and found the prospective parents fit, scheduled a final adoption hearing, and appointed Better Living Services as "next friend." On May 24, 1985 a final judgment of adoption was entered.
On May 23, 1986 Wright moved to set aside the final judgment of adoption, to be permitted discovery, to have the case transferred to the Rosebud Sioux Tribe, and to have counsel appointed under 25 U.S.C.A. § 1912(b). The judge denied the bulk of Wright's requests but allowed him limited access to the *34 adoption file. On September 24 Wright renewed his motion to vacate the final judgment of adoption. On October 17 a motion to intervene and to vacate the adoption was filed on behalf of Wright's two sisters, his brother, father, uncle and aunt. After argument the judge denied both applications. Wright and the proposed intervenors appealed by notice of December 31. On January 13, 1987 we ordered the appeal expedited.
This is the factual background established by the affidavits and documents presented on the motions. Baby Larry was born on August 17, 1984 in Winner, South Dakota, a town adjacent to and off of the Rosebud Sioux Reservation. His mother, Jane Doe, is an enrolled member of the Rosebud Sioux tribe. She became aware of her pregnancy in December 1983, the same month Wright moved into her residence in Winner where she and her son had been living and receiving ADC payments. She had one child by Wright previously. In her affidavit Doe said that Wright denied being the father of Baby Larry and gave her money to have an abortion. Jane Doe's mother also filed an affidavit which said that Wright told her that he was not Baby Larry's father.
In April 1984 Jane Doe contacted attorneys in New York about placing her unborn child for adoption. She said that Wright knew that she intended to place the child. When Jane Doe gave birth to Baby Larry at the Baptist Memorial Hospital in Winner, Wright went to Mission, South Dakota, and never came to see the child. On August 25, 1984, seven days after his birth, Baby Larry was turned over to his present New Jersey parents, respondents Terrence and Melissa. At that time Jane Doe signed a consent form for the adoption of the child. In the form she said that she did not know the identity of the natural father. Nothing in the executed consent forms and affidavit suggests that Baby Larry was an Indian child.
After the initial complaint was filed the judge set November 16, 1984 as the date for a preliminary hearing and termination of parental rights. R. 5:10-5. Notice of the hearing was sent *35 to the natural mother; on October 1 she returned a copy acknowledging the notice of hearing and reaffirming her consent to adoption. Sometime before the preliminary hearing Sklar received a phone call from Wright whom he said claimed to be Baby Larry's natural father. Wright said to Sklar that he would consent to the adoption. The present attorney for the adoptive parents produced a copy of a letter that Sklar attempted to send Wright on September 18, 1984. The letter enclosed a consent to adoption, a notice of hearing, and $1 to pay for the notarization. The letter was sent certified in care of Doe, the mother; another copy was sent to Wright's sister's address in Mission. Wright filed an affidavit with his motion in which he said that he never received a notice of hearing but that he did receive a consent to adoption in September 1984 which he refused to sign. Nobody can produce any return receipts for these letters.
As a result of talking to Wright, Sklar filed an amended complaint which stated that Wright had claimed to be the natural father and that he had orally agreed to consent to the adoption but had failed to return a written consent. The amended complaint also alleged Wright's neglect and foresaking of parental obligations. Sklar's letter to the Surrogate's Court of Middlesex County dated October 15, 1984 reported his activities in this regard.
Gentlemen,
Enclosed herewith is an amended complaint in the above-captioned matter.
I am filing the amended complaint because one KENNETH WRIGHT, JR., P.O. Box 824, Mission. S.D. 57555 alleges to be the natural father of the child to be adopted.
In a conversation that I had with Mr. Wright on or about September 30, 1984 he agreed to consent to the adoption and sign a written consent but to date, I have not received same from him.
Mr. Wright was served with Notice of Hearing by regular and certified mail-return receipt requested on September 19, 1984 in care of the natural mother and at the address above on September 26, 1984. Enclosed herewith are copies of the post office receipt for the certified mailing.
Mr. Wright acknowledged to me in our conservation that he did receive the Notice of Hearing.

*36 I am also enclosing herewith a copy of the letter sent to Mr. Wright, a copy of the notice of Hearing sent to him and a copy of the Notice of Hearing with acknowledgment of receipt and a reaffirmation of consent by the natural mother.
The judge then appointed Better Living Services, a social service agency which he had relied upon successfully in the past, to investigate the adoption proposal. The agency reported that the child was Caucasian, in good health, with normal growth and development and that the natural mother had told the adopting parents that she was Caucasian, not married, and further that
The natural mother told the plaintiffs that she decided to place the child for adoption because she could not adequately care for him. She had a two year old son who was living with her and she did not feel she could support two children. The plaintiffs called the natural mother once after the placement of the child and told her how the child was doing. The natural mother has not been in touch with them.
The natural father was not named by the natural mother. The plaintiffs stated that a man named Kenneth Wright identified himself to their attorney as the father of the child. He apparently indicated his willingness to consent to the adoption.
The adoptive parents told the judge that they did not know that Baby Larry was an Indian until the end of May in 1986, a week before the first hearing on the motion to reopen on June 6. The judgment of adoption was entered on May 24, 1985. Thereafter Sklar had asked the adoptive parents to pay a bill incurred from a South Dakota lawyer by a New York couple who had also expressed an interest in Baby Larry. Terrence and Melissa did not know what the charges were for and refused to pay the bill. Terrence and Melissa did not find out that the bill allegedly was for "Indian Law" research until the June 1986 hearing.
Meanwhile, Wright said that after he got the consent form from Better Living Services he contacted various tribal, federal and private agencies seeking help in obtaining custody of Baby Larry. In September 1984 he asked the Rosebud Sioux Tribal Court for tribal intervention. The tribe declined assistance. One day short of a year after the final judgment, Wright filed the motion for relief from the May 24, 1985 adoption judgment *37 under R. 4:50-1(c). Such a motion is time-barred after one year. He claimed that the Indian Child Welfare Act applied and that the matter should be reopened and tried under the Act. He then filed a supplemental affidavit stating he was 17/32 Rosebud Sioux. At this point the judge, as noted, denied the requested relief but allowed Wright's counsel limited access to the file.
In September upon renewal of the motion to reopen, Wright attached to his motion a letter from the tribe that it would not participate in the proceeding. He also attached a memorandum from the tribal enrollment director and the chairman of the tribe stating that as of September 19, 1986 Baby Larry was not eligible for enrollment in the tribe. Based solely on his mother's lineage, he did not have sufficient Indian blood to qualify for membership. The memo said in pertinent part
Jane Doe is an enrolled member of the Rosebud Sioux Tribe, with the identification number of 345-U18655 and is 9/32 Rosebud Sioux. Although Jane's father is from the Oglala Sioux Tribe, at the time of the enrollment, his blood did not apply and only if Jane Doe requests this total blood quantum change, can we do it. The only other way, is through or with a Court Order.
With all this information gathered, the natural child will not qualify for enrollment as of this date, based only on the mother's enrollment. Unless we have a certified birth certificate, or a Paternity Affidavit from the father, of course the mother must be in agreement with the father's signature on the birth record.
From what the record discloses, no affidavit of paternity was ever filed with the tribe or anywhere else.
The Wright "extended family," two sisters, uncle, and his father and aunt and uncle, obtained pro bono counsel in October 1986 and moved to intervene. Amy Whiting, of Mission, Wright's sister, stated that she would raise the child if he were placed with the extended family.
On November 7, 1986 Judge Longhi denied the motions to reopen and intervene. He specifically found that "there is not even a hint in this case of any fraud," certainly not by the adopting parents. He found that "there was service of the notice of the hearing of the amended complaint and the preliminary *38 order on the file" upon appellant Wright. The judge concluded
I have a file on the original adoption which indicates to me that there was service of the notice of the hearing of the amended complaint and the preliminary order on the file. I know that he [Wright] received it  strike that. I know that he received that information at least to the extent by his admission of that there was an attempt to adopt because he was told or he was given a form to sign consenting to it. He showed that to his sister. That was in September of 1984. '84, am I correct? Yes, '84.
The file reflects that that notice  that that document was part of a packet of things that he received. He states he got that information from Better Living Services. I know as a fact and that's undisputed that he did not receive it from Better Living Services. They were not in the case yet. Hadn't been appointed. If he received anything from Better Living Services it was later on. And so that he knew that they were in the case then at some point.
The notice according to Mr. Sklar was sent out included the opportunity to be heard, notices that you could be heard. That is that his parental rights were going to be terminated and that he had a right to a lawyer. If he couldn't afford one that one would be appointed to him and Sklar's notices include Middlesex County Legal Services' address and their telephone number which he eventually contacted. Whether he did that personally or whether the indian tribe did that for him, I don't know but they were contacted.
He did go based upon his information and his sister's affidavit to the tribe for help. They  he says that they turned him down. Meanwhile he knew that his parental rights were about to be severed or could have possible been severed. He didn't write to the Court.
The judge felt that Wright waited "too long if there was some problems with Indian laws." He said
In so far as this Court was concerned at the time that it heard it there were no violations of the Indian Child Welfare Act, and he had an opportunity to bring that to my attention. He truly did. He could have just written to me. He could have done something. Didn't do anything other than go to the indian tribe and when they turned him down I don't know what he did in a timely fashion. None of his affidavits really get around that. They do not explain the time involved in this case. It just does not explain it.
The judge also concluded that at the time of the hearings the child was not an "Indian Child"[3] because his mother's blood *39 alone did not qualify him for membership in the Rosebud Sioux without an acknowledgement of his Indian father's paternity and blood line. In the circumstance the judge concluded that the sound exercise of discretion required the judgment to stand and that the child should stay with his adoptive parents where he had lived since the eighth day of his life and for the past 27 months (now 34 months).
ICWA provides that "[a]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, ..." 25 U.S.C.A. § 1911. The Act provides for concurrent jurisdiction in cases like the one before us where the child is not residing or domiciled on the reservation
In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, that such transfer shall be subject to declination by the tribal court of such title. [First emphasis added; second emphasis included; 25 U.S.C.A. § 1911(b)].
The exercise of jurisdiction by the Family Part in this matter was permitted by federal law because Baby Larry and his mother did not live on the Rosebud Sioux Reservation but lived in Winner.
Appellants also contend as part of this appeal that the New Jersey courts lacked any jurisdiction in the matter because Baby Larry and his mother were domiciled in South Dakota. We reject this contention. Our Supreme Court stated in Fantony v. Fantony, 21 N.J. 525, 535 (1956),
The appellant initially invoked the extensive jurisdiction of our courts. This jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of the parents. It has its origin in *40 the protection that is due to the incompetent or helpless, and our jurisdiction parens patriae is firmly established in our jurisprudence and is derived from common law, our case law and the statutes. Hachez v. Hachez, supra [124 N.J. Eq. 442]; Brown v. Parsons, 136 N.J. Eq. 493, 500, 501 (E. & A. 1945); Henderson v. Henderson, 10 N.J. 390, 395 (1952), and the cases cited there. N.J.S.A. 9:2-1 et seq. and N.J.S. 2A:34-23 both supplement the parens patriae jurisdiction. Conwell v. Conwell, 3 N.J. 266, 272 (1949).
See also Lutheran Social Services of N.J. v. Doe, 172 N.J. Super. 343, 346-347 (Law Div. 1979).
There are two prerequisites for the application of ICWA. It applies to (1) child custody proceedings[4], (2) involving Indian children. 25 U.S.C.A. §§ 1903(1), 1903(4) and 1903(9). Matter of Appeal in Maricopa County, 136 Ariz. 528, 667 P.2d 228, 231 (Ariz. App. 1983); Matter of Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168, 176 (1982). The record is clear that neither the judge nor the adopting parents had reason to believe that Baby Larry was an Indian child. There was no error therefore in initially not applying ICWA in the termination and adoption proceedings. The notice provisions of ICWA are not triggered until "the court knows or has reason to know that an Indian child is involved." 25 U.S.C.A. § 1912(a).[5] One academic commentator has noted

*41 An additional enforcement problem arises because, under the terms of the Act, the child's parents and tribe are to be notified of a custody proceeding only if "the court knows or has reason to know that an Indian child is involved." To invalidate a child placement for lack of notice, the parents or tribe must prove not that the child is in fact an Indian, but that the state court knew or had reason to know that the child is an Indian. If the child's Indian status is not discovered until after the placement, the Act does not mandate reversal. [Barsh, "The Indian Child Welfare Act of 1978," 31 Hastings L.J. 1287, 1323 (1980)].
The Department of the Interior, Bureau of Indian Affairs has published guidelines for state courts to use in Indian child custody proceedings. They provide
(a) When a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe.
(c) Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include but are not limited to the following:
(i) Any party to the case, Indian tribe, Indian organization or public or private agency informs the court that the child is an Indian child.
(ii) Any public or state licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.
(iii) The child who is the subject of the proceeding gives the court reason to believe he or she is an Indian child.
(iv) The residence or the domicile of the child his or her biological parents or the Indian custodial is known by the court to be or is shown to be a predominately Indian community.
(v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child.
[Guidelines for State Courts: Indian Child Custody Proceedings, Federal Register Vol. 44, No. 22, Nov. 26, 1979 p. 67584].
These guidelines are not binding on the courts, but they provide useful guidance in these cases. In re Junious, 144 Cal. App.3d 786, 193 Cal. Rptr. 40 (1983). Only Paragraph V may be implicated here. There is reason to suspect from the record that attorney Sklar knew from the outset of the child's Indian blood. But there is no suggestion that either the judge, *42 the adoptive parents, or the investigating agency had any such knowledge.
There is even substantial doubt whether Wright or his extended family would be entitled to relief under the Act as literally construed even if the adoption is upset. 25 U.S.C.A. § 1914 is entitled: "Petition to court of competent jurisdiction to invalidate action upon showing of certain violations." The section states
Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title. [Emphasis supplied].
Since Wright or the family never had custody originally, a court would not necessarily be obligated to turn Baby Larry over to them under this section. See In the Interest of S.A.M., 703 S.W.2d 603, 607 (Mo. App. 1986); see also Matter of Adoption of Baby Boy L., 231 Kan. 199, 643 P.2d 168 (1982); 25 U.S.C.A. § 1916(a) and (b) ("Return of Custody").
This motion to reopen the judgment of adoption on grounds of fraud and misrepresentation was presented to Judge Longhi under R. 4:50-1(c). Such a motion "is addressed to the sound discretion of the trial court, guided by equitable principles." Hodgson v. Applegate, 31 N.J. 29, 37 (1959) (analysis of R. 4:62-2, the antecedent of R. 4:50-1). "The trial courts discretion will be upheld in the absence of an abuse of discretion." Ibid. In Quick Chek Food Stores v. Springfield Tp., 83 N.J. 438, 445-445 (1980), Justice Schreiber said: "These motions [under R. 4:50-1] are addressed to the sound discretion of the trial court and will not be disturbed unless that discretion has been clearly abused." Our leading procedural authority reiterates that: "The motion for vacation of the judgment based on any one of the six grounds is addressed to the sound discretion of the trial court, whose determination will be left undisturbed unless it results from a clear abuse of discretion." Pressler, Current N.J. Court Rules, Comment R. 4:50.
*43 We think that there is no area of the law where the doctrine of stability and finality of judgments deserves more deferential consideration than in relatively long-term custody and adoption situations. See New Jersey Div. of Youth & Family Services v. A.W., 103 N.J. 591, 616 (1986) ("the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, are more realistically expressed as the least harmful or least detrimental alternative."); Sorentino v. Family & Children's Soc. of Elizabeth, 74 N.J. 313, 320 (1977) (finding that a change of custody from adopting parents after 31 months created strong likelihood of immediate serious emotional and psychological harm continuing through lifetime affirmed). Moreover, the concept of the "best interest of the child" is recognized in ICWA. 15 U.S.C.A. § 1916(a). See also In Re Interest of Bird Head, 213 Neb. 741, 331 N.W.2d 785, 791 (1983) ("The Indian Child Welfare Act does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus...."). In Matter of Appeal in Maricopa County, 136 Ariz. 528, 667 P.2d 228, 234 (Ariz. App. 1983), the court stated in a case similar to the one before us
Here, the trial court exercised his discretion in weighing the failure to comply with the Act once the paternity of the father was established and the tribal interest in the child against the fact that the baby girl had resided with the adoptive mother for three years; that a close mother-child relationship with the adoptive mother had been established; and that the baby's removal would cause psychological damage. These findings were supported by evidence and therefore the trial court did not abuse its discretion in ordering the adoption of the child. Under these circumstances, we find no abuse of discretion in the decision of the trial court declining to follow the preferences for adoptive placement.
We cannot conclude on this record that Judge Longhi's refusal to reopen the judgment of adoption constituted a clear abuse of discretion which should be reversed. The lack of knowledge that the child was Indian during the initial proceeding, the actual notice to Wright of the pendency of the proceedings, the passage of time, and the psychological bonding which has occurred since the adoptive parents gained custody on August 25, 1984 are all factors which suggest, rather, a sound exercise of discretion by the judge in refusing to entertain *44 further proceedings in this matter. We reach this conclusion as a matter of State procedural law with full awareness of the laudatory goals of Congress in enacting ICWA as means of preserving the integrity of the Indian family and tribes. See State v. Kirk, 202 N.J. Super. 28, 34-36 (App.Div. 1985); Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983). We simply feel that this claim by Wright and the extended family comes much too late in the circumstance. We do not think Congress intended the disruption of children's lives in situations like this.
Finally, we have considered the members of the "extended family" as intervenors of right on this appeal and have considered their contentions equally with those of appellant Wright. See R. 4:33-1; 25 U.S.C.A. § 1911(c).
Affirmed.
NOTES
[1] The adoptive parents requested anonymity and their name and the child's name are fictitious. The appellants did not desire anonymity.
[2] The natural mother's name is also fictitious.
[3] Under ICWA an Indian child is any unmarried person under 18 who is either "a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is a biological child of a member of an Indian tribe." Baby Larry's status is uncertain under this definition without any formal acknowledgement of paternity upon which the Rosebud Sioux tribal enrollment body can act.
[4] Custody proceedings include foster care placement, termination of parental rights proceedings, preadoptive placements, and adoptive placements. 25 U.S.C.A. § 1903(1).
[5] 25 U.S.A.C. § 1912(a) states

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.