# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

FILED

November 19, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

IN RE: JEFFREY THOMAS MORGAN )
)
) Shelby Chancery No. 106077
)
) Appeal No. 02A01-9608-CH-00206
)

APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
AT MEMPHIS, TENNESSEE

### THE HONORABLE D. J. ALISSANDRATOS, CHANCELLOR

For the Appellee, United Methodist
Adoption Services:

Diana L. Schmied
Bartlett, Tennessee

For the Appellant, The Tohono
O'odham Nation:

Mark E. Curry
Sells, Arizona

Russell C. Winston
Memphis, Tennessee

For the Appellees,
Adopting Couple:

Kevin W. Weaver
Cordova, Tennessee

For Jeffrey Thomas Morgan By His
Court-Appointed Attorney Ad Litem:

Kay F. Turner
Attorney Ad Litem
Memphis, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is an adoption case in which the Tohono O'odham Indian Nation seeks to intervene pursuant to the federal Indian Child Welfare Act. The trial court denied the motion to intervene, finding the Act inapplicable under the "existing Indian family doctrine." In a case of first impression in Tennessee, we affirm the decision of the trial court.

Jeffrey Thomas Morgan ("Jeffrey"), was born on July 13, 1994 to Gloria Saraficio Morgan, ("Mother"). Jeffrey was Mother's fourth child. Both Jeffrey and Mother are non-domiciliary members of the Tohono O'odham Indian Nation ("Nation"), a federally recognized American Indian tribe. Mother has lived away from reservation lands for the past 15 years, and has lived in Dyersburg, Tennessee for the past twelve years. Mother was unmarried at the time of Jeffrey's birth, but identified Jeffrey Manners, a Caucasian, as the father. No father, however, was named on the birth certificate or on the response to the Putative Father Registry request, and no one has claimed paternity or attempted to legitimate or acknowledge the child.

After Jeffrey's birth, Mother met with officials from United Methodist Adoption Services ("Agency") to develop an adoption plan for Jeffrey. Jeffrey was placed in foster care immediately following his birth. The Agency sent a letter to the Nation on July 23, 1994, informing them of Mother's intention to put Jeffrey up for adoption, and also requesting information concerning the Nation's adoption policies. The Nation did not respond to this letter. The Agency's attorney then sent a certified letter to the Nation, received on September 6, 1994. The certified letter set forth the Agency's plan to terminate the putative father's rights and again informed the Nation of the intended adoption plan. The letter requested that the Nation contact the Agency with any objections to the plan. The Nation did not respond to this letter.

In October 1994, the Juvenile Court of Shelby County entered a default judgment terminating the parental rights of the putative father. The putative father did not contest the termination of his parental rights. On October 18, 1994, Mother voluntarily surrendered her parental rights to the Agency. The Agency then placed the child with the proposed adoptive parents. The adoptive parents filed their petition to adopt Jeffrey. Subsequently, on April 17, 1995, the Agency's attorney sent another certified letter to the Nation, stating that the placement had been made and that the adoption was pending. The Nation received this letter on April 25, 1995. On April 26, 1995, the Nation contacted the Agency's attorney by telephone to request information.

On July 21, 1995, the Nation filed motions in the Shelby County Juvenile Court for leave to

intervene and to invalidate the Juvenile Court's order terminating the putative father's parental rights. The Nation also filed a motion to intervene in the adoption proceedings in Shelby County Chancery Court, and a motion to stay those proceedings.

The Juvenile Court determined that it did not have jurisdiction to consider the Nation's motions in light of the adoption petition pending in Chancery Court. It deferred to the Chancery Court, pursuant to Tennessee Code Annotated § 36-1-106(d) (1996), to determine the issues raised in the Nation's motions. The Chancery Court appointed a guardian ad litem and an attorney ad litem for the minor child and ordered the prospective adoptive couple and the Nation to deposit two thousand dollars each with the Chancery Court for payment of fees and expenses incurred by the guardian ad litem and the attorney ad litem.

On August 18, 1995, the Nation filed additional motions in Chancery Court, pursuant to the federal Indian Child Welfare Act ("ICWA"). The Nation filed a Motion to Transfer Jurisdiction Pursuant to the ICWA, a Motion to Invalidate the Order Terminating Parental Rights of the Natural Father and Request to Open Proceedings, and a Request for Leave to Conduct an Evaluation of the Minor. The Nation noted that Mother's first child, John Vincent Morgan, was removed from Mother's custody by Texas authorities. He was placed with his maternal grandmother, who lives on the Tohono O'odham reservation. They continue to live on the reservation.

Subsequently, the attorney ad litem filed a Motion to Determine the Applicability of the ICWA and urged the trial court to find the Act not applicable based on the "existing Indian family exception" to the Act, discussed below. The attorney ad litem argued that the trial court should deny all of the Nation's pending motions. The Nation's motions were also opposed by the adoptive parents and the Agency.

The Chancery Court held a hearing on all of the parties' pending motions. The Chancery Court found that the facts warranted application of the existing Indian family doctrine and that, consequently, the ICWA did not apply. Therefore, the Nation's motion to intervene was denied. Because it found the ICWA not applicable to this case, the trial court found all remaining pending motions brought by the Nation moot. The trial court granted the Nation the right to an interlocutory appeal of its ruling. The Nation then filed this appeal.

Subsequently, the prospective adoptive couple filed a motion to modify the record on appeal to delete the parties' legal memoranda and the records of the Shelby Court Juvenile Court from the

2

record. This motion was granted.

On appeal, the Nation asserts that the trial court erred in denying its motion to intervene, and maintains that the ICWA is applicable and requires the court to permit the Nation's intervention in this proceeding. The Nation also appeals the trial court's modification of the record on appeal to delete the legal memoranda and the juvenile court records. Additionally, the Nation contends on appeal that the trial court erroneously refused to consider its motion to invalidate the termination of the putative father's parental rights. Finally, the Nation appeals the trial court's order requiring it to pay part of the fees and expenses incurred by the guardian ad litem and attorney ad litem.

We will first consider the Nation's argument that the trial court erred in denying its motion to intervene. The trial court's decision was based on the adoption of the existing Indian family doctrine, a judicial exception to the applicability of the terms of the ICWA. This is a policy determination which is an issue of first impression in Tennessee. Before addressing such an issue, we will determine whether the ICWA, without consideration of the doctrine, is applicable in this case. If the ICWA is otherwise applicable, we will then consider whether the existing Indian family doctrine should be adopted in Tennessee. The remaining issues will then be addressed.

OVERVIEW OF THE ICWA

The Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901-1963 (1983) ("ICWA"), is a comprehensive federal statute which gives federally recognized American Indian tribes certain rights with regard to children of Indian heritage. In some instances, the tribal courts are given exclusive jurisdiction over custody proceedings involving such children; in other instances, the tribe is given the right to intervene in state court proceedings and assert the provisions of the ICWA which affect such custody proceedings. For example, 25 U.S.C. § 1915(a) states that in the adoptive placement of an Indian child, preference is given to placement with a member of the child's extended family, other members of the child's tribe, or other Indian families.

The federal standards set forth in the ICWA preempt state law which provides a lower standard of protection for the rights of the parent or the Indian custodian of an Indian child. 25 U.S.C. § 1921 (1983). *See also In re Dependency & Neglect of N.S.*, 474 N.W.2d 96, 100 (S.D. 1991) (Sabus, J., concurring specially) ("The Indian Child Welfare Act . . . is a preemptive federal law which governs all custody proceedings involving Indian children except those incident to

3

divorce or to criminal acts committed by the child.").

In *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989) the United States Supreme Court first considered the ICWA in a case involving whether an Indian tribe should be permitted to remove a proceeding on the adoption of two Indian children from a state trial court to a tribal court. The Court gave the following background on the ICWA:

> The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. Senate oversight hearings in 1974 yielded numerous examples, statistical data, and expert testimony documenting what one witness called "[t]he wholesale removal of Indian children from their homes, . . . the most tragic aspect of Indian life today." Indian Child Welfare Program, Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings).
>
> Further hearings, covering much the same ground, were held during 1977 and 1978 on the bill that became the ICWA. While much of the testimony again focused on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves of the massive removal of their children. For example, Mr. Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association, testified as follows:
>
>> "Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People. Furthermore, these practices seriously undercut the tribes' ability to continue as self-governing communities. Probably in no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships." 1978 Hearings, at 193.
>
> See also *id.*, at 62. Chief Isaac also summarized succinctly what numerous witnesses saw as the principal reason for the high rates of removal of Indian children:
>
>> "One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child." *Id.*, at 191-192.
>
> The congressional findings that were incorporated into the ICWA reflect these sentiments. The Congress found:

4

> "(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . .;
>
> "(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> "(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901.
>
> The ICWA thus, in the words of the House Report accompanying it, "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." House Report, at 23, U.S.Code Cong. & Admin.News 1978, at 7546. It does so by establishing "a Federal policy that, where possible, an Indian child should remain in the Indian community," *ibid.*, and by making sure that Indian child welfare determinations are not based on "a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family." *Id.*, at 24, U.S.Code Cong. & Admin.News 1978, at 7546.

*Id.* at 1599-1602.

To accomplish its objectives, the ICWA permits the intervening tribe, under some circumstances, to obtain invalidation of the parent's voluntary consent to adoption of an Indian child or invalidation of the State's termination of parental rights. This sometimes resulted in disruption to an Indian child who had already been placed in a situation not conforming to the requirements of the ICWA.

This led to the adoption in some states of the "existing Indian family" doctrine, relied upon by the trial court in this case. The "existing Indian family" doctrine was first established in 1982 by the Kansas Supreme Court in *In re Adoption of Baby Boy L.*, 643 P.2d 168, 176 (Kan. 1982). In *Baby Boy L.*, the Court determined that the ICWA did not apply to an adoption proceeding involving a non-Indian mother's illegitimate child, who had never been in the care or custody of the Indian father:

> A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother.

*Id.* at 175.

Since ***Baby Boy L.***, some states have adopted the existing Indian family doctrine, while others have rejected it. States rejecting it have relied in part on the United States Supreme Court's decision in ***Holyfield***, cited above.

In this case, we will first determine whether the provisions of the ICWA are applicable. If so, we will then discuss whether the existing Indian family doctrine is applicable to this case and whether it should be adopted in Tennessee, in order to determine whether the trial court erred in denying the Nation's motion to intervene. After that, we will consider the Nation's other issues on appeal, whether the trial court erred in modifying the record on appeal, in failing to consider the Nation's remaining motions, and in ordering the Nation to pay a portion of the fees of the attorney ad litem and the guardian ad litem.

## APPLICABILITY OF THE ICWA

In 25 U.S.C. § 1901, Congress sets forth the reason for the broad statutory scheme in the ICWA. It notes Congress' interest in the "integrity of Indian tribes," and observes that an "alarmingly high percentage" of Indian children are removed from their Indian families and "placed in non-Indian foster and adoptive homes . . . ." ***Id.*** § 1901(3) and (4). It also recognizes that the States, in exercising jurisdiction over Indian child custody proceedings, had "often failed to recognize the essential tribal relations of Indian people" and their "cultural and social standards. . . ." ***Id.*** § 1901(5). In enacting the ICWA, Congress sought to establish:

> . . . minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. . .

***Id.*** § 1902.

It is undisputed in this case that Jeffrey is an "Indian child" within the meaning of ICWA. ***See*** 25 U.S.C. § 1903(4) (1983) ("the biological child of a member of an Indian tribe"). The ICWA

may apply to a "child custody proceeding," defined in the Act to include adoptive placement as well as the termination of parental rights. *Id.* § 1903(1)(ii) and (iv).

The Nation in this case does not argue that the tribal court has exclusive jurisdiction over the proceedings involving Jeffrey. The tribal court has exclusive jurisdiction over proceedings involving an Indian child "who resides or is domiciled within the reservation of such tribe. . . ." *Id.* § 1911(a). It is undisputed that Jeffrey has never resided on the reservation. Transfer of the proceedings to the tribal court may be mandated, in the absence of good cause to the contrary, provided neither parent objects. *Id.* § 1911(b). In this case, it is undisputed that Jeffrey's mother objects to the Nation's intervention and assertion of jurisdiction over Jeffrey. Consequently, transfer of this proceeding to the Nation's tribal court is not at issue.

Section 1911(c) addresses the Nation's right to intervene in these proceedings. It states:

> In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, . . . the Indian child's tribe shall have a right to intervene at any point in the proceeding.

25 U.S.C. § 1911(c) (1983). In this case, the Nation sought to intervene in the Juvenile Court proceeding in which the putative father's rights were terminated and the Chancery Court proceedings for Jeffrey's permanent adoptive placement. There is no indication in the record that the Nation sought to invalidate the Mother's voluntary relinquishment of her parental rights and consent to Jeffrey's adoption.

To determine whether Section 1911(c) affords the Nation the right to intervene in the Juvenile Court proceeding in which the putative father's rights were terminated, we must look at the meaning of "termination of parental rights" under the ICWA. Section 1903(1)(ii) defines the phrase as "any action resulting in the termination of the parent-child relationship." The term "parent" means the "biological parent" of an Indian child, but specifies that it "does not include the unwed father where paternity has not been acknowledged or established." *Id.* § 1903(9). In this case, the putative father did not respond to the Attorney General's petition to terminate his parental rights, and a default judgment was entered doing so. The putative father's paternity was neither acknowledged nor established; the proceeding merely terminated whatever parental rights he may have had.

In *In re Adoption of Baby Boy D*, 742 P.2d 1059, 1064 (Okla. 1985), the Oklahoma Supreme Court held as follows:

> Until such time as a father has acknowledged or established paternity, the ICWA is not applicable. Congress has by this language evidenced its intent not to extend the ICWA to the child born out of wedlock as in the instant case, whose father has never had custody and has not acknowledged or established paternity. We take this to mean acknowledged or established through the procedures available through the tribal courts, consistent with tribal customs, or through procedures established by state law.

Therefore, termination of the putative father's parental rights is not a "termination of parental rights" within the meaning of the ICWA, and Section 1911(c) does not give the Nation the right to intervene in the Juvenile Court proceeding. *See id.*; *In re Appeal in Maricopa County Juvenile Action No. A-25525*, 667 P.2d 228, 233 (Ariz. App. 1983) ("According to the Act . . . there must be more than mere speculation of paternity."); *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 933 (N.J. 1988).

Section 1911(c) mentions only proceedings for "the foster placement" of an Indian child or "the termination of parental rights to" an Indian child. 25 U.S.C. § 1911(c) (1983). It does not refer to a proceeding for the permanent adoptive placement of an Indian child. *In re J.R.S.*, 690 P.2d 10, 15 (Alaska 1984) ("In short, we think Congress recognized that terminations and adoptions might be handled in separate actions."). Therefore, Section 1911(c) does not give the Nation the right to intervene in the Chancery Court proceeding for Jeffrey's permanent adoptive placement.

The Nation asserts that the Agency failed to provide the required notice under Section 1912(a), which states in part:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.

25 U.S.C. § 1912(a) (1983). In this case, the only "involuntary" proceeding was the termination of the parental rights of the putative father, by default. However, as noted above, the term "parent" specifically excludes "the unwed father where paternity has not been acknowledged or established," and this would exclude the putative father in this case. *Id.* § 1903(9). Consequently, Section 1912(a) did not mandate that notice to the Nation be given of the involuntary proceeding to terminate the putative father's parental rights. *See In re S.A.M.*, 703 S.W.2d 603, 607 (Mo. App. 1986); *In re Child of Indian Heritage*, 543 A.2d at 933 ("The significance of this statutory definition (of

8

'parent') is that unless (the putative father's) paternity had been acknowledged or established prior to the final entry of judgment of adoption and termination of parental rights, he was not a parent entitled to notice pursuant to the provisions of § 1912(a).").

Section 1912(d) requires any party seeking the termination of parental rights to an Indian child make "active efforts. . . to provide remedial services . . . designed to prevent the breakup of the Indian family" and show that the efforts were "unsuccessful." 25 U.S.C. § 1912(d) (1983). No specific showing was made by the Nation in this regard. Moreover, as noted above, the record does not indicate that the Nation sought to invalidate the Mother's voluntary relinquishment of her parental rights.

Section 1912(f) prohibits an order of termination of parental rights:

> . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. §1912(f) (1983). It is undisputed that no such determination was made in this case. However, application of this section to the facts of this case seems inappropriate where neither the Mother nor the putative father ever had custody of the child, so that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." *Id.*

Section 1913 sets forth measures designed to ensure that a parent who voluntarily relinquishes parental rights to an Indian child fully understands the consequences of such an action. However, as noted above, there is no allegation in this case that the Mother did not understand her actions or that her consent was invalid.

Section 1914 also addresses the Nation's right to intervene in the state court proceeding. It states:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

25 U.S.C. § 1914 (1983). This statute gives the Nation the right to seek invalidation of a foster care placement or a termination of parental rights if the Nation makes a showing that there was a violation of Sections 1911, 1912 or 1913. As set forth above, there has been no showing of a violation of Sections 1911, 1912, or 1913. Therefore, the Nation has no right to intervene pursuant to Section

1914.  *See, e.g., In re Baby Boy D*, 742 P.2d at 1064.

The Nation also asserts the applicability of the adoptive preferences set forth in 25 U.S.C. § 1915(a).  This section states:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a) (1983).  Section 1915(c) also states that the preference of the parent may be considered.  25 U.S.C. § 1915(c) (1983).  "Although the Act explicitly provides a tribe with the right to intervene in foster care and termination proceedings . . . it does not preclude a trial court from exercising its discretion in allowing intervention by a tribe in an adoption proceeding."  *In re Maricopa County*, 667 P.2d at 233.

The Nation argues that it has the right to intervene to assert these adoptive preferences pursuant to Rule 24 of the Tennessee Rules of Civil Procedure.  Rule 24.01 sets forth the standards for intervention as a matter of right:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties; or (3) by stipulation of all the parties.

Under Rule 24.01(2), the Nation certainly "claims an interest" relating to the subject of this action, its interest in asserting the adoptive preferences set forth in 25 U.S.C. § 1915(a).  The disposition of this action, making Jeffrey's adoption by the adoptive couple final, would "impede" the Nation's ability to protect that interest.  Tenn. R. Civ. P. 24.01.  As demonstrated by the strenuous objections of the adoptive agency, the adoptive couple and the attorney ad litem to the Nation's intervention, the Nation's interest is not adequately represented by any of the existing parties.  Therefore, if the ICWA is applicable in this cause, Rule 24.01 of the Tennessee Rules of Civil Procedure appears to give the Nation the right to intervene to assert the adoptive preferences set forth in 25 U.S.C. § 1915.

Consequently, it is necessary to consider whether the "existing Indian family" doctrine should be adopted in Tennessee, in order to determine whether the trial court erred in denying the Nation's motion to intervene in this cause.

Prior to the United States Supreme Court's decision on *Holyfield*, a number of states adopted what has become known as the "existing Indian family doctrine" or the "existing Indian family exception" to the ICWA. As discussed above, it was initially set forth in *In re Adoption of Baby Boy L.*, 643 P.2d 168, 176 (Kan. 1982). In *Baby Boy L.*, the mother of the illegitimate child was a non-Indian, who had consented to the child's adoption by a non-Indian couple. The father, of Indian heritage, was served notice of the adoption proceedings while in prison. He sought to block the adoption and to obtain custody of the child. The father's Indian tribe also sought to intervene to assert the provisions of the ICWA.

The court in *Baby Boy L.* found that the Congress' overriding concern in enacting the ICWA was to maintain Indian family and tribal relationships. *Id.* at 175. It found that Congress' intent "was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." *Id.* Rather, it found that "the underlying thread" throughout the ICWA was concern "with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family." *Id.* Therefore, the Court concluded that "the ICWA, by its own terms, does not apply to these proceedings. . . ." *Id.* at 176.

Other courts utilized this reasoning in interpreting the applicability of the ICWA. *See, e.g., In re Adoption of D.M.J.*, 741 P.2d 1386, 1389 (Okla. 1985); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988). This doctrine came to be known as the "existing Indian family doctrine" or the "existing Indian family exception" to the ICWA. *In re Adoption of T.N.F.*, 781 P.2d 973, 977 (Alaska 1989).

Other courts, prior to *Holyfield*, declined to adopt the doctrine. For example, in *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925 (N.J. 1988), the Supreme Court of New Jersey held that the fact that a mother had voluntarily placed her child up for adoption did not preclude the applicability of the ICWA even though the child had never been exposed to an Indian environment. Criticizing the existing Indian family doctrine, the court reasoned:

> We disagree with this interpretation of the Act because it posits as a determinative jurisdictional test the voluntariness of the conduct of the mother. The Act itself does not suggest this factor as a jurisdictional test of the Act's coverage, although it is

> unquestionably relevant in the Act's application. . . . The effect on both the tribe and the Indian child of the placement of the child in a non-Indian setting is the same whether or not the placement was voluntary.

*Id.* at 932. *See also In re J.R.S.*, 690 P.2d 10, 16 (Alaska 1984) (holding that the ICWA "does not limit a state court's power to allow intervention in child custody proceedings").

HOLYFIELD

Although the decision of the United States Supreme Court in *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 104 L.Ed.2d 29, 109 S.Ct. 1597 (1989), does not address the existing Indian family doctrine, it construes the ICWA provisions for exclusive tribal jurisdiction over child custody proceedings.

*Holyfield* involved two unwed Indian parents who resided on the reservation. They traveled away from the reservation for the birth of their twins and made plans for the children to be adopted by a non-Indian couple, the Holyfields. Both parents relinquished their parental rights and consented to the adoption.

Subsequently, the parents' tribe moved to vacate the adoption, asserting that the ICWA gave the tribal court exclusive jurisdiction. The trial court noted that the natural parents "went to some efforts to see that [the twins] were born outside the . . . Reservation" and to arrange for their adoption by the Holyfields. *Id.*, 109 S.Ct. at 1603. It also noted that the twins had never resided on the reservation. Consequently, it denied the tribe's motion to vacate the adoption. This was affirmed by the state supreme court, and the tribe appealed. *Id.*

The United States Supreme Court first found that state law should not be applied in defining "domicile" because Congress "intended a uniform federal law of domicile for the ICWA." *Id.* at 1607. It then noted that the domicile of an illegitimate child is generally the domicile of the mother. It observed that the mother had remained domiciled on the reservation, and that the twins' domicile was therefore the reservation "even though they themselves had never been there." *Id.* at 1608.

The Court stated that the mother's voluntary surrender of the twins did not change the result. *Id.* It maintained that Congress did not intend for the parents of an Indian child to be able to defeat the application of the ICWA simply by giving birth to their children off the reservation, while the parents remained domiciled on the reservation. *Id.* at 1608-1611. The Court recognized that the ICWA protects the interests of the tribe, as well as the interests of individual Indian children and

12

families. *Id.* at 1609. It quoted with approval a Utah decision which stated that, under the ICWA, "the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents." *Id.* at 1610 (quoting *In re Adoption of Halloway*, 732 P.2d 962, 969-70 (Utah 1986)).

The Court also cited with approval *In re Adoption of a Child of Indian Heritage*, for the proposition that "congressional objectives make clear that a rule of domicile that would permit individual Indian parents to defeat the ICWA's jurisdictional scheme is inconsistent with what Congress intended." *Id.* at 1609 (citing *In re Adoption of a Child of Indian Heritage*, 543 A.2d 925, 931-33 (N.J. 1988)). Therefore, the Court concluded that the state court lacked jurisdiction to enter a decree of adoption, and that the tribal court had exclusive jurisdiction over the proceedings. *Id.* at 1611.

State courts have split in their application of the *Holyfield* decision to the issue of the existing Indian family doctrine. Some courts have rejected the doctrine, relying on *Holyfield* in their reasoning. Others have adopted the existing Indian family doctrine, noting that *Holyfield* does not address it. The difference in reasoning by these courts has been succinctly described by the Utah appellate court:

> The fundamental difference between the jurisdictions is that those in favor of the doctrine see it as a policy prerequisite to application of ICWA, while those in opposition to the doctrine consider it an impermissible, judicially-created exception contrary to ICWA's plain-language.

*State of Utah, in re D.A.C.*, 933 P.2d 993, 998 (Utah App. 1997). We will first discuss the cases that reject the existing Indian family doctrine, then those that adopt it.

### DECISIONS REJECTING THE EXISTING INDIAN FAMILY DOCTRINE

Since *Holyfield*, state courts that decide not to adopt the existing Indian family doctrine have almost inevitably cited *Holyfield* in support of this position. In one of the first state court decisions on this issue after *Holyfield*, the Supreme Court of Alaska rejected the doctrine. *See In re Adoption of T.N.F.*, 781 P.2d 973 (Alaska 1989). Citing *Holyfield*, it emphasized that, in enacting the ICWA, Congress sought to protect the interests of the Indian tribes, as well as the interests of the Indian

children and their parents. *Id.* at 977. The Alaska court commented:

> State courts must be particularly hesitant in creating judicial exceptions to a federal act which was enacted to counter state courts' prejudicial treatment of Indian children and communities. . . . [T]o utilize a judicially-created "Indian family" exception would be to enter onto a slippery slope which threatens to exclude the very type of cases Congress had in mind when it adopted the Act.

*Id.* at 977-978. The Idaho Supreme Court also rejected the doctrine, citing *Holyfield*:

> Although an Indian family requirement has been applied by the courts of other states, we believe that the United States Supreme Court has effectively undermined the imposition of this requirement. . . . [*Holyfield*] indicates that the jurisdictional provisions of ICWA apply to child custody proceedings involving Indian children regardless of where the children are born or where they are proposed for adoption. This application of ICWA is based on the interest the tribe has in its children.
>
> ****
>
> We also reject application of an Indian family requirement because the provisions of ICWA do not contain any limitation based on where the child is located. Limiting ICWA to situations in which an Indian child is being removed from an existing Indian family is, therefore, a judicially created exception to ICWA. Congress passed ICWA to limit state court power by creating mandatory protective procedures and minimum evidentiary standards that must be applied in child custody proceedings concerning Indian children. In light of the structure and nature of ICWA, it is inappropriate to use a judicially created exception to circumvent the mandates of ICWA.

*In re Baby Boy Doe*, 849 P.2d 925, 931-32 (Idaho 1993); *see also In re N.S.*, 474 N.W.2d at 100-101 (Sabers, J. concurring specially) ("... *Holyfield* ... authoritatively established the principle that the provisions of ICWA are to be strictly construed and applied."); *In re D.A.C.*, 933 P.2d at 999 ("The policies of the Act ... are frustrated by the adoption of the existing Indian family exception."); *In re Adoption of Quinn*, 845 P.2d 206, 209 (Ore. App. 1993); *In re Elliott*, 554 N.W.2d 32, 35-36 (Mich. App. 1996); *In re Crystal K.*, 276 Cal. Rptr. 619, 624-25 (Cal. App. 1990); *In re Adoption of Baade*, 462 N.W.2d 485, 489-90 (S.D. 1990).

Therefore, courts that reject the existing Indian family doctrine generally consider it a judicially-created exception, contrary to the plain language of the ICWA and cite *Holyfield* as supporting a strict construction of the Act. As discussed below, however, other courts have determined that *Holyfield* does not preclude adoption of the existing Indian family doctrine.


DECISIONS ADOPTING THE EXISTING INDIAN FAMILY DOCTRINE

Notwithstanding *Holyfield*, some states have adopted the existing Indian family doctrine, demonstrating an unwillingness to apply the ICWA in situations in which the Indian children had little or no exposure to an Indian environment prior to their removal to non-Indian families.

Prior to *Holyfield*, Oklahoma had adopted the existing Indian family doctrine. *See Baby Boy D.*, *supra*; *In re D.M.J.*, *supra*. This holding was reaffirmed by the Oklahoma Supreme Court after *Holyfield*, in *In re S.C.*, 833 P.2d 1249, 1254-56 (Okla. 1992). In *In re S.C.*, the Indian father of a five-year-old Indian child and a six-year-old Indian child sought to invalidate the foster placement of the children, pursuant to the ICWA, after having had no contact with the children prior to the initiation of court proceedings. The Oklahoma court reaffirmed its adoption of the existing Indian family doctrine, and found the Act inapplicable because "there was no existing Indian family being broken up as contemplated by the ICWA." *Id.* at 1253. The Indian father argued that *Holyfield* implicitly overruled earlier cases adopting the doctrine. The *In re S.C.* court stated:

> As for the far-reaching interpretation suggested by Father, we decline to extend the case to the facts at bar. *Holyfield* stands for two propositions: (1) that federal law pre-empts state law as to the definition of domicile, and (2) the domicile of an Indian child is that of the mother if the child is born out of wedlock. Other courts have construed this case similarly, confining it to the issues presented and the holding reached. . . . We do not believe that *Holyfield* invalidates either *Baby Boy D.* or *In re: D.M.J.*.

*Id.* at 1254 (citations omitted). The Oklahoma court also addressed the argument that the existing Indian family doctrine is a judicially-created exception to the ICWA, not contemplated by Congress:

> *D.M.J.* does not create an exception not contemplated by the legislature. Rather, the preservation of the existing Indian family was an integral purpose of the ICWA from its inception. The ICWA was never meant to apply in those cases such as *D.M.J.*, where the daughter had lived with her non-Indian mother some seven years since the divorce from the Indian father. Nor was it meant to apply in this case, where five and six years had gone by without the father's being involved. As stated in *In re Adoption of Baby Boy L*, 231 Kan. 199, 643 P.2d 168 (1982):
>
> > "the underlying thread that runs throughout the entire Act [is] to the effect that the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family."
>
> Our interpretation is supported by recent events in the Congress. In 1987 amendments were presented by the Senate Committee on Indian affairs. These proposed amendments were occasioned by the courts' refusing to apply the ICWA to situations like this one. The amendments, if enacted, would have made application of the ICWA mandatory regardless of whether the child had "previously lived in Indian country, in an Indian cultural environment or with an Indian parent." *See* S.1976, 100th Cong., 1st Sess., 133 Cong. Rec. S18532, S18533 (daily ed. Dec.19, 1987) (proposed amendment to Section 1903(1)). However, the amendments never came out of the Senate Committee, and at the time of this writing, have not been presented again. Congress, being aware of this Court's decision in *In re D.M.J.*, as well as decisions from other states using similar reasoning, has refused to change the statutory language to do away with this interpretation.

*Id.* at 1255.

This reasoning was relied upon by the Kentucky Supreme Court in *Rye v. Weasel*, 934

S.W.2d 257, 261 (Ky. 1996). In *Rye*, an Indian child was removed from her Indian mother at birth and placed with foster parents. The foster father was Indian, the foster mother was not. The child's biological father was unidentified. *Id.* at 259. Years later, the foster parents divorced, and the non-Indian foster mother was awarded custody of the Indian child. *Id.* at 260. The Kentucky Supreme Court affirmed, finding that the ICWA was not applicable because of the existing Indian family doctrine. *Id.* at 264. The *Rye* court found that *Holyfield* did not address the existing Indian family doctrine and was not contrary to it. *Id.* at 262-63. It stated that Congress did not intend the ICWA to apply to situations involving children of Indian heritage who had never lived in an Indian family. *Id.* at 264. The Kentucky court cited favorably the Oklahoma decision in *In re S.C.*, observing: "Oklahoma, which contains a large Indian population and consequently [is] one of the states most often presented with this vexing problem, has been one of the leading states in developing [the existing Indian family] doctrine." *Id.* at 261.

In adopting the existing Indian family doctrine, some courts have looked not only at whether the Indian child was being removed from an existing Indian family, but also at whether the child would be placed into an Indian environment if the ICWA were applied. In *In re Adoption of Crews*, 825 P.2d 305, 310 (Wash. 1992), the mother of the child at issue was of Indian ancestry, although at the time the child was born she was uncertain how much "Indian blood" she had. The father was non-Indian. The biological parents selected an adoptive couple and voluntarily relinquished their parental rights. After the baby was born, the mother signed a consent to adoption and the child was placed in the temporary custody of the potential adoptive parents. Within days, the mother began seeking the return of the baby and a reinstatement of her parental rights. *Id.* at 306-07.

When the baby was approximately three months old, the mother filed a petition pursuant to the ICWA, seeking an order vacating the termination of her parental rights. The record indicated that the mother researched her Indian heritage in order to reinstate her parental rights and had had no previous contact with her tribe. The trial court found the ICWA inapplicable and denied the mother's petition to reinstate her parental rights. The mother's tribe was later permitted to intervene on appeal to argue the applicability of the ICWA. *Id.* at 307-08.

The Washington court cited the statement in **Baby Boy L.**, *supra*, that the ICWA concerns "the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family." **Id.** (quoting **Baby Boy L.**, 643 P.2d at 175). It noted that the Indian mother had never been part of an Indian family unit and had no plans to move to the reservation if her parental rights were reinstated. **Crews**, 825 P.2d at 310. It cited cases from other jurisdictions holding the ICWA inapplicable where the Indian child was not being removed from an Indian environment, and found that **Holyfield** did not preclude such a holding. **Id.** The **Crews** court stated:

> **Holyfield** supports our conviction that ICWA is not applicable when an Indian child is not being removed from an Indian cultural setting, the natural parents have no substantive ties to a specific tribe, and neither the parents nor their families have resided or plan to reside within a tribal reservation. In such a situation, whether or when a child meets the definition of "Indian child" under ICWA is not controlling.
>
> We are not unmindful that prior abusive child welfare practices may have cut off large numbers of persons from their Indian heritage. Furthermore, there may be instances where the application of ICWA would result in the placement of an Indian child back into an Indian environment. This is not the case before us. It is within the narrow circumstances presented by the specific facts of this case that we find ICWA not applicable.

**Id.** at 310-11 (citation omitted). Thus, the **Crews** court looked not only at whether the Indian child was being removed from an existing Indian family, but also at whether application of the ICWA would result in the child being returned to an Indian environment. **See also In re Bridget R.**, 49 Cal. Rptr. 2d 507, 522 (Cal. App. 1996) ("[I]t does not follow from **Holyfield** that ICWA should apply when neither the child *nor either natural parent* has ever resided or been domiciled on a reservation or maintained any significant social, cultural or political relationship with an Indian tribe."); **In re Adoption of S.S.**, 657 N.E.2d 935, 944-45 (Ill. 1995) (Heiple, J., concurring) (asserting that "[t]he **Holyfield** Court . . . never refers to the existing Indian family exception," and that the exception is still valid); **In re T.S.**, 801 P.2d 77, 82 (Mont. 1990); **In re C.E.H.**, 837 S.W.2d 947, 952 (Mo. App. 1992); **In re Hampton**, 658 So. 2d 331, 336-37 (La. App. 1995); **In re Alexandria Y.**, 53 Cal. Rptr. 2d 679, 684-86 (Cal. App. 1996);

Some courts have suggested that the ICWA would not be constitutional in the event that the existing Indian family doctrine is not recognized. This is premised on a possible infringement of the Fifth, Fourteenth, and Tenth Amendments.[1]

---

[1]A California court first noted this possible infirmity in **In re Bridget R.**, 49 Cal. Rptr. 2d 507 (Cal. App. 1996):

In this case, Mother is of Indian heritage but does not live on the reservation and has had little or no contact with the Nation for over fifteen years. The putative father is non-Indian. The child was voluntarily relinquished at birth and has lived with the prospective adoptive parents throughout these proceedings. When Jeffrey was one year old, after several communications from the Agency, the Nation sought to intervene to assert the provisions of the ICWA. In its pleadings, the Nation implies that Jeffrey could be placed with Mother's extended family on the reservation. Mother objects to the Nation's intervention in this case.

If the ICWA is applicable, then the Nation would be permitted to intervene to assert the adoptive preferences set forth in 25 U.S.C. § 1915.[2] We must therefore determine if the ICWA is intended to apply to circumstances such as these, that is, whether Tennessee should adopt the existing Indian family doctrine.

---

> [I]n our view, there are significant constitutional impediments to applying ICWA, rather than state law, in proceedings affecting the family relationships of persons who are not residents or domiciliaries of an Indian reservation, are not socially or culturally connected with an Indian community, and, in all respects *except genetic heritage*, are indistinguishable from other residents of the state. These impediments arise from the due process and equal protection guarantees of the Fifth and Fourteenth Amendments and from the Tenth Amendment's reservation to the states of all powers not delegated to the federal government. We must, of course, construe the statute to uphold its constitutionality.

*Id.* at 522. This was also noted in *In re Alexandria Y.*, 53 Cal. Rptr. 2d 679, 686 (Cal. App. 1996) ("recognition of the existing Indian family doctrine [is] necessary to preserve the ICWA's constitutionality."). The *Alexandria* court recognized three possible constitutional violations:

> (1) impermissibly intruding upon a power ordinarily reserved to the states; (2) interfering with Indian children's fundamental due process rights respecting family relationships; and (3) depriving Indian children of equal opportunities to be adopted and exposing them to an unequal chance of having non-Indian families torn apart based solely on race, in the absence of a compelling state purpose.

*Id. But see In re Adoption of Riffle*, 922 P.2d 510, 514 (Mont. 1996) ("[W]e hold that the application of the ICWA does not deny (the child) her constitutional rights and we decline to adopt the California Court's approach in *In re Bridget R.*").

[2] It should be noted that Section 1915 provides for application of the adoptive preferences "in the absence of good cause to the contrary...." The considerable delay by the Nation in asserting the provisions of the ICWA must be taken into account in such a determination. The Nation failed to respond to several letters from the Agency, the first sent to The Nation shortly after Jeffrey's birth. During the period of delay, Jeffrey lived with the adoptive parents over a year, long enough to view them as his mother and father. The emotional trauma to the child of removal, in the face of such unwarranted delay, must be considered.

We are wary of an exception to a federal statute created by state courts. *See In re Adoption of T.N.F.*, *supra*; and *Matter of Baby Boy Doe*, *supra*. However, in interpreting any statute, federal or state, we must be mindful of the purpose for which the statute was enacted. *Sharp v. Richardson*, 937 S.W.2d 846, 850 (Tenn. 1996) ("The role of the Court in construing statutes is to ascertain and give effect to the legislative intent."). We are persuaded that the ICWA was intended to remedy "the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family." *Baby Boy L.*, 643 P.2d at 175; *see also* 25 U.S.C. § 1901 (1983); *Holyfield*, 109 S. Ct. at 1599-1602. The ICWA, by its terms and the Congressional statement of its purpose, does not reflect an intent to apply to circumstances such as these, in which the putative father is a non-Indian, and the Indian mother years ago left the reservation. By all indications, even if Jeffrey had remained with Mother, he would not be raised in an Indian environment. Rather than preserving an existing Indian family, application of the ICWA under these circumstances would disrupt the adoptive family unit to place in an Indian environment a child who has had no contact with the reservation. We agree with courts finding that the ICWA was not meant to apply to such situations. *See In re S.C.*, *supra*; *Rye v. Weasel*, *supra*; *Crews*, *supra*; *Bridget R.*, *supra*; *Adoption of S.S.*, *supra* (Heiple, J., concurring); *In re T.S.*, *supra*; *In re C.E.H.*, *supra*; *Hampton v. J.A.L.*, *supra*; *Alexandria Y.*, *supra*.

We must note that at least one court has also appeared to require, in order to apply the existing Indian family doctrine, a showing that the Indian child would not be placed in an Indian environment if the ICWA were applied. *See Crews*, *supra*; *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. App. 1992). We decline to adopt such a requirement, because we find that the terms and stated purpose of the ICWA indicate that it was intended to prevent the breakup of existing Indian families.

Therefore, we find the provisions of the ICWA inapplicable to the facts of this case, based on the existing Indian family doctrine. The trial court's denial of the Nation's motion to intervene is affirmed on this basis.

The Nation also appeals the trial court's order requiring it to pay part of the fees and expenses incurred by the guardian ad litem and the attorney ad litem. We find no abuse of discretion by the trial court in requiring such payment. The remaining issues raised by the Nation on appeal are pretermitted by our affirmance of the trial court's denial of the Nation's motion to intervene based

19

on the inapplicability of the ICWA.

The decision of the trial court is affirmed. Costs are taxed to the Appellant, for which execution may issue if necessary.

_____

_____**HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____

**W. FRANK CRAWFORD, P. J., W.S.**


_____

**DAVID R. FARMER, J.**