NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

PAMELA J., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.C., J.C., NAVAJO NATION,
*Appellees*.

No. 1 CA-JV 19-0384
FILED 5-21-2020

Appeal from the Superior Court in Maricopa County
No.  JD35052
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Denise Lynn Carroll Attorney at Law, Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge David B. Gass joined.

---

**C R U Z**, Judge:

¶1        Pamela J. ("Mother") appeals the juvenile court's order terminating her parental relationship to her children, T.C. and J.C.  For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        Mother gave birth to T.C. in November 2011, and J.C. in September 2013.  Mother and the children are enrolled members of the Navajo Nation.

¶3        In the early hours of November 2017, Phoenix police found Mother unconscious behind the wheel of her car in a parking lot with a beer can in her hand.  Mother's children were asleep in the car with her, and there was also a man in the car who Mother was unable to identify.  Mother told the police she and her children were living in the car.

¶4        As a result of a pending warrant from Flagstaff, for failure to pay a fine for a possession of marijuana conviction, Mother was arrested.  When the officers asked Mother if she had any relatives who could take custody of the children, Mother said the unidentified man could take custody of them.  Mother said she had no relatives in Arizona, and she did not know the whereabouts of the biological father, Thomas C. ("Father").

¶5        The Department of Child Safety ("DCS") took custody of the children and filed a dependency petition. Following Mother's release from custody, the court ordered Mother to complete random drug testing, substance-abuse treatment through TERROS, and supervised visits.  The court also ordered that DCS provide Mother with transportation for her participation in services.  Mother participated in a TERROS intake evaluation, but she was not recommended for services at that time. Although Mother participated in urinalysis testing from December 2017 through October 2019, she was largely inconsistent and missed a significant number of tests.  Mother was closed out of the service in November 2018 due to her lack of participation.  Although this service was opened again in

December 2018, Mother showed little improvement in her testing consistency through July 2019. All the tests Mother did complete were negative for illicit substances.

¶6       Mother successfully closed out of parent-aide services in July 2018. However, Mother was also inconsistent with her supervised visitations throughout the dependency, and she was sometimes late, or she would not attend at all. Mother was never able to progress to unsupervised visits because she did not fully understand why her children were in DCS care, she did not acknowledge she suffered from substance-abuse issues, she was inconsistent with drug testing, and she did not have a stable home or employment.

¶7       In June 2019, Mother was arrested again and charged with possession of methamphetamine. Mother pled guilty to a lesser charge and was placed on probation for two years. Mother sought substance-abuse treatment and she completed an intake with Native American Connections ("NAC") in early July 2019. NAC recommended that Mother engage in intensive outpatient treatment. However, Mother did not engage in this treatment, and after a few weeks she failed to contact NAC. NAC reached out to Mother on multiple occasions without success and ultimately closed her out of the service.

¶8       The case plan was then changed to severance and adoption, and in August 2019, DCS moved to terminate Mother's parental rights. At this point, twenty-one months into the dependency, Mother did agree to participate in outpatient treatment at NAC, and she entered NAC's residential treatment facility. Mother was discharged from the residential treatment facility in October 2019, and she was transferred to a supportive housing site. Mother lived at this housing location while she attended NAC's intensive outpatient program. Mother began to participate in drug tests consistently, and her tests were all negative for substances.

¶9       The severance hearing took place on November 5 and 6, 2019. The juvenile court terminated Mother and Father's parental rights based on the children's out-of-home placement for a period of fifteen months or longer.[1] *See* Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c). Mother timely appealed. We have jurisdiction pursuant to A.R.S. § 8-235 and Ariz. R.P. Juv. Ct. 103(A).

---

[1]      Father is not a party to this appeal.

**DISCUSSION**

I.      Termination of Parent-Child Relationship

**¶10**        Although the right to custody of one's children is fundamental, it is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248-49, ¶¶ 11-12 (2000).  The juvenile court may terminate a parent-child relationship if it finds at least one statutory ground for severance under A.R.S. § 8-533(B), and that termination is in the child's best interests. *Id.*

**¶11**        In a termination proceeding involving an Indian child, a state court must additionally comply with the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901-1963.  Under ICWA, the juvenile court must make two additional findings.  First, it must be persuaded that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have been unsuccessful." *Id.* § 1912(d).  Second, there must be "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(f).

**¶12**        We accept the juvenile court's factual findings if reasonable evidence supports them and will affirm its severance ruling unless it is clearly erroneous. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016).

>       A.      The Juvenile Court Found a Statutory Ground for
>               Termination Exists Under A.R.S. § 8-533

**¶13**        The juvenile court terminated Mother's parental rights under A.R.S. § 8-533(B)(8)(c).  Pursuant to this statute, a juvenile court may terminate a parental relationship if DCS "has made a diligent effort to provide appropriate reunification services" to the parent, and the court finds that

> [t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order or voluntary placement pursuant to § 8-806, the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future.

4

A.R.S. § 8-533(B)(8)(c).

**¶14**        The juvenile court found that DCS provided Mother with appropriate reunification services, which included a parent aide, a case aide, drug testing, substance-abuse assessment and treatment, and transportation.  However, the court found that Mother was unable to remedy the circumstances that caused the children to be in an out-of-home placement: substance abuse.  Additionally, the court found that there was no substantial likelihood that Mother would be capable of demonstrating sobriety in the near future.

**¶15**        In determining whether a parent would be able to overcome her substance abuse and "be in a position to parent the child in the foreseeable future," the court considers "the treatment history of the parent." *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 378, ¶ 25 (App. 2010) (citation omitted).  Where the parent has been unable to "experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting." *Id.*  Mother has a long history of substance abuse.  Mother testified she began consuming alcohol at age ten, smoking marijuana at age twelve, and consuming methamphetamine at age fifteen.  Mother also testified she did not seek substance-abuse treatment until nearly two years after DCS took custody of her children because she did not recognize that she had a substance-abuse problem.

**¶16**        We recognize Mother has demonstrated sobriety since she began her substance-abuse treatment in August 2019, but she has achieved sobriety only in controlled settings: residential centers and sober-living facilities.  It is unclear whether Mother would be able to maintain her sobriety in an uncontrolled and unsupervised environment.  Additionally, testimony at trial indicated that it would require six to twelve months for Mother to demonstrate long-term sobriety; she had only been able to demonstrate less than three months of sobriety at the time of trial, and only after Mother was convicted of a drug-related charge and the case plan changed to severance.  The juvenile court did not clearly err in finding that Mother would be unable to exercise proper and effective parental care in the near future.

**¶17**        Although Mother argues she should be given more time in this case to demonstrate long-term sobriety, she has already been given two years to do so.  DCS cannot leave "the window of opportunity for remediation open indefinitely," and the juvenile court found that Mother's efforts were "too little, too late." *Maricopa Cty. Juv. Action No. JS-501568*,

177 Ariz. 571, 577 (App. 1994). The children's interest in permanency must prevail over Mother's battle with drugs and the uncertainty of her future. *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 17 (App. 2016).

### B. Termination is in the Children's Best Interests

**¶18** Termination is in a child's best interests if the child will benefit from severance, or the child will be harmed if the court denies it. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). Factors for whether the child will benefit from severance are whether: "1) an adoptive placement is immediately available; 2) the existing placement is meeting the needs of the child; and 3) the children are adoptable." *Raymond F.*, 224 Ariz. at 379, ¶ 30 (citations omitted). The juvenile court found that the current placement has been meeting the children's needs, it allows the children to remain together, and the current placement intends to proceed with adoption.

**¶19** Mother argues that at trial, all of her witnesses testified about the love she has for her children. The juvenile court considered Mother's bond with her children, and did not "doubt that she loves the children and that the children love her." The existence of a bond between biological family members, "although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 12 (App. 2016). The instability suffered by the children was evident in February 2019, when T.C. told the DCS case manager that he felt let down and that he sometimes did not want to participate in visits with Mother because he would be there and Mother would not show. The court did not clearly err in finding that it was in the children's best interests to terminate the parental relationship, as the "[c]urrent placement is providing the children with a loving and nurturing home environment" and the "stability and permanency" Mother has been unable to provide.

### C. DCS Made Active Efforts to Prevent the Breakup of the Indian Family, and These Efforts Were Proven Unsuccessful

**¶20** The juvenile court found DCS "made active efforts [to maintain the Indian family] by providing an array of reunification services" to Mother. As noted above, these services included a referral for a parent aide, referral for a case aide, drug testing, substance-abuse assessment and treatment, and transportation to facilitate Mother's ability to participate in services. However, the juvenile court found these efforts had proven unsuccessful, as Mother was unable to demonstrate consistent sobriety for any meaningful duration.

¶21        Notwithstanding this record, Mother argues that DCS failed to make "active efforts" to prevent the breakup of the family, as she often had trouble getting into contact with her case manager. However, even if there were some communication issues between Mother and her case manager, there is no evidence this lack of communication is what led to severance. Mother had access to urinalysis testing and substance-abuse treatment for twenty-one months, but she failed to take full advantage of these services until the three months leading up to the severance hearing. Indeed, Mother herself testified at trial that she knew she had access to these services, but she did not participate in substance-abuse treatment earlier, because she did not believe she had a drug problem. As the juvenile court noted, "[i]f those services had been successfully completed, reunification likely would have occurred."

¶22        Mother also argues against the juvenile court's finding that she was unsuccessful in her participation in services. Mother argues that she successfully completed parent-aide services, she participated in intensive outpatient care for six weeks, and she successfully completed residential inpatient treatment in October 2019. Additionally, Mother argues at the time of trial she was participating in an outpatient program.

¶23        However, Mother was inconsistent with attending her supervised visits, or she would arrive late. Additionally, and as explained above, Mother failed to demonstrate any long-term sobriety. The children were taken into DCS custody in November 2017, and Mother did not begin substance-abuse treatment until August 2019. In regard to urinalysis testing, Mother admitted she "could've done better." From January 2018 through October 2019, Mother completed only about one-third of her drug tests. At the severance hearing, the DCS case manager testified that DCS is unable to ensure a parent is demonstrating sobriety unless that parent participates in consistent drug testing. Although Mother tested negative for illicit substances for those tests she did complete, her inconsistency and failure to test for weeks, sometimes months, fails to demonstrate sobriety. Mother also admitted to consuming methamphetamine and alcohol as late as June and July 2019.

¶24        Although Mother had shown behavioral changes in the few months leading up to trial, Mother's "temporary abstinence from drugs and alcohol does not outweigh [her] significant history of abuse or [her] consistent inability to abstain during this case." *Raymond F.*, 224 Ariz. at 379, ¶ 29. The juvenile court, therefore, did not clearly err when it found DCS made "active efforts" to prevent the breakup of the Indian family.

### D. Continued Custody is Likely to Result in Serious Emotional or Physical Damage to the Children

**¶25** Finally, Mother argues that there is no evidence her continued custody of the children is likely to result in serious emotional or physical damage to them. Mother argues that at trial, there was testimony that she loved and cared for her children.

**¶26** Although that may be true, there was also testimony that Mother was very inconsistent with urinalysis testing for twenty-one months, Mother admitted to using methamphetamine and consuming alcohol through July 2019, and Mother refused to submit to a hair follicle test in August 2019. Pursuant to ICWA, expert testimony was presented by Cassandra Gorman, a social worker with the Navajo Nation. Gorman testified she believed Mother should have addressed her substance abuse issues a long time ago. Gorman further testified she believed continued custody by Mother would result in serious damage to the children because of Mother's inability to establish long-term sobriety, establish a home, and find a job, as well as continue to frustrate the children's needs for permanency.

**¶27** The juvenile court found that "Mother's inability to demonstrate sobriety in nearly two years (coupled with a recent drug-related conviction)" was proof beyond a reasonable doubt that continued custody would result in serious emotional damage to the children. *See Raymond F.*, 224 Ariz. at 378, ¶¶ 21-22 (finding that a parent's chronic drug abuse prevented the parent from discharging parental duties, protecting the children from harm, and providing the children with a safe home). This finding was not clearly erroneous.

**¶28** Mother is essentially asking this court to reweigh the evidence; however, "[t]he juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). Accordingly, this court looks only to determine if there is reasonable evidence to sustain the court's ruling. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). Here, Mother's inability to maintain sobriety and the expert testimony at trial is sufficient evidence to affirm the juvenile court's ruling.

II.     Deviation from ICWA Placement Preferences

¶29     Mother argues that the superior court erred by failing to satisfy ICWA requirements when DCS failed to place her children with an Indian relative.  ICWA provides that with respect to adoptive placements "of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."  25 U.S.C. § 1915(a).  The juvenile court found good cause to deviate from this requirement and to keep the children with the foster family that wished to adopt them.  We review a finding of good cause to deviate from ICWA preferences for an abuse of discretion.  *Maricopa Cty. Juv. Action No. A–25525*, 136 Ariz. 528, 533-34 (App. 1983).

¶30     Factors for good cause include:

> (i) The request of the biological parents or the child when the child is of sufficient age.  (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.  (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

*Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 345, ¶ 19 (App. 2012) (quoting *Guidelines for State Courts; Indian Child Custody Proceedings*, 44 Fed.Reg. 67,584, 67,594 (Nov. 26, 1979)).

¶31     The juvenile court noted Mother failed to object to the children's placement prior to the severance hearing, and found Mother waived the right to argue against the placement decisions.  However, the court also found good cause to deviate based upon DCS' efforts to locate an ICWA-compliant placement for the children, and its inability to do so throughout the pendency of the case.  Although Mother argues she has continuously brought up the names of relatives for potential placement throughout the dependency, the ICWA expert and Navajo Nation case worker testified at trial that in regard to the names of these relatives, Mother was "not bringing them up right away."  DCS also documented that at the start of the dependency, Mother "was not forthcoming about her status with the Navajo Nation . . . and potential placements for the children."

¶32     Mother also argues DCS failed to explain why her relatives were denied approval for placement, and she argues that the paternal grandmother was not given adequate consideration.  At trial, the DCS case manager testified DCS looked into placement with a maternal aunt and a

maternal uncle, but they were deemed unacceptable as potential placements because of issues discovered in their background checks. There was also testimony at trial that the paternal grandmother was living in a "halfway house" at the beginning of the dependency, and after she moved, she failed to maintain contact with DCS. The ICWA expert testified that during the pendency of the case DCS conducted background checks on about five relatives as potential placements. She stressed that DCS had "been trying for so long" to find an ICWA-compliant placement, but "they've just been denied" because of issues with the relatives' backgrounds.

¶33 Additionally, there was testimony at trial that a relative placement was preferred even at the time of severance, and two potential relative placements who were brought to the recent attention of DCS were still pending. The record of proceedings shows that DCS is "still looking into the two maternal aunts as potential adoptive placements." Currently, there have been visitations between the maternal aunt and the children, as the children previously did not have much contact with her. At this time, it is still possible the children may still be placed with a family member. We find no error.

## CONCLUSION

¶34 For the foregoing reasons, we affirm.

