# IN THE COURT OF APPEALS OF IOWA

─────────────────

No. 25-1529
Filed February 11, 2026

─────────────────

**In the Interest of M.W.-T. and C.W.-T., Minor Children,**

**State of Iowa,**
Appellant.

─────────────────

Appeal from the Iowa District Court for Polk County,
The Honorable Rachael E. Seymour, Judge.

─────────────────

**REVERSED AND REMANDED**

─────────────────

Brenna Bird, Attorney General, and Mackenzie L. Moran,
Assistant Attorney General, attorneys for appellant.

Andrea McGinn of The Law Shop Iowa, Van Meter, attorney for
appellees intervenors.

Lynn Vogan of Juvenile Public Defender, Des Moines, attorney and
guardian ad litem for minor children.

─────────────────

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Sandy, J.

1

**SANDY, Judge.**

This appeal turns on a narrow but mandatory question of jurisdiction. After parental rights were terminated, the Rosebud Sioux Tribe moved to transfer the child-custody proceedings to tribal court under Iowa Code chapter 232B (2025). The juvenile court denied the request, finding good cause based on perceived logistical and procedural hardships. On our de novo review, the record does not support that conclusion. Because the statutory exception to mandatory transfer was not established, the court was required to grant the Tribe's motion. We therefore reverse and remand for transfer of jurisdiction.

## FACTS & PROCEDURAL BACKGROUND

M.W.T., born in July 2016, and C.W.T., born in October 2018, are minor children who have resided in Polk County, Iowa, throughout the pendency of these proceedings. The children came to the attention of the Iowa Department of Health and Human Services (HHS) in March 2022 following concerns regarding inadequate supervision and parental substance use. Law enforcement responded to reports that the children had been outside their residence for an extended period without adult supervision. When officers entered the home, the mother was unaware of the children's whereabouts and was in violation of an active no-contact order. One child was later located several blocks away from the home. As a result, the State sought and obtained an order for temporary removal in March of 2022.

The children were subsequently adjudicated children in need of assistance under Iowa Code section 232.2(6)(c)(2) and (6)(n) (2022). The juvenile court ordered services aimed at reunification, including substance-abuse treatment, mental-health services, and visitation as permitted by criminal no-contact orders. The father did not meaningfully participate in

2

services and ultimately consented to the termination of his parental rights. The mother engaged intermittently in treatment services over the course of the case, including residential and transitional substance-abuse programming, but struggled to maintain sustained sobriety and consistent engagement with services addressing the children's trauma.

In June 2022, the children were placed with maternal relatives, C.R. and R.R. They remained in that relative placement for approximately two years. During that time, the case proceeded through review and permanency hearings. The children received therapeutic and educational services and demonstrated behavioral improvement in the structured placement, though significant needs persisted.

In December 2023, following termination proceedings, the juvenile court entered an order terminating the parental rights of both parents and placing the children in the guardianship of HHS for purposes of permanency planning.

The mother appealed the termination and in August 2024, we reversed the termination of the mother's parental rights, concluding the juvenile court's order did not comply with the statutory requirements governing expert testimony under the Indian Child Welfare Act (ICWA). We remanded the case for further proceedings. *See In re M.W.T.*, 13 N.W.3d 852, 855 (Iowa Ct. App. 2024).

While that appeal was pending, HHS removed the children from the relatives' home in July 2024 and placed them in an adoption-only foster placement based on concerns arising in the relatives' home. Those concerns were investigated but ultimately not confirmed. Following the removal, the

relatives moved to intervene in the juvenile proceedings, and the court granted the intervention.

In September 2024, the State filed a second petition to terminate the mother's parental rights. However, after termination hearings in January 2025, the mother consented to termination. On April 1, the juvenile court entered a second termination order, again terminating the mother's parental rights. In that order, the court removed HHS as guardian, found HHS had acted unreasonably in its handling of the children's placement, and appointed the juvenile court as guardian while leaving physical custody with HHS pending further placement determinations.

Throughout the proceedings, the Rosebud Sioux Tribe received notice based on the father's tribal affiliation. Although the children were not enrolled members, they were determined to be eligible for enrollment. The Tribe participated informally through its ICWA specialist but did not formally intervene until May 2025.

On May 20—after both parents' rights had been terminated—the Tribe filed a motion seeking transfer of jurisdiction to the Tribe pursuant to ICWA and Iowa Code chapter 232B. The State supported the transfer. However, the intervening relatives and the guardian ad litem resisted, citing the advanced procedural posture of the case, the children's lack of connection to the reservation, and practical hardships associated with the transfer.

The juvenile court held hearings on the motion to transfer on May 27 and June 9. The Tribe presented testimony that its court could conduct proceedings remotely and would assume jurisdiction if transfer were granted. In August, the juvenile court denied the motion concluding that good cause

existed to deny transfer under Iowa Code section 232B.5(13) (2025), including the length and complexity of the proceedings, the children's established ties in Iowa, and the logistical and procedural burdens associated with transferring jurisdiction at that stage.

The State applied for interlocutory appeal, which was granted.[1]

## STANDARD OF REVIEW

Child welfare proceedings are generally reviewed de novo. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). The juvenile court's factual findings are given weight, but they are not binding. *Id.* Statutory interpretations are reviewed for correction of errors of law. *In re N.V.*, 744 N.W.2d 634, 636 (Iowa 2008).

## DISCUSSION

### I.  Federal ICWA

Congress enacted ICWA in 1978 to address the removal of an alarmingly high percentage of Indian[2] children from their Indian families by nontribal public and private agencies and the placement of such children in non-Indian foster and adoptive homes and institutions. *See* 25 U.S.C. § 1901(4). In response to these concerns, ICWA provides a dual jurisdictional

---

[1] Although a denial-of-transfer order under ICWA is not an appealable final order, *see In re T.F.*, 972 N.W.2d 1, 8 (Iowa 2022), Iowa Rule of Appellate Procedure 6.104 provides that a party may apply to the supreme court for permission to appeal an interlocutory order.

[2] We are mindful that the term "Indian" is not necessarily the preferred nomenclature for Native Americans; however, the term is used in the statutes at issue in this case as well as the case law. Therefore, we use the term for the purpose of consistency and clarity.

scheme over Indian child custody proceedings. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989). ICWA delineates "child custody proceeding" into four categories: foster care placement[3], termination of parental rights[4], preadoptive placement, and adoptive placement. 25 U.S.C.

---

[3] The first jurisdictional component of ICWA, § 1911(a), concerns all four categories of actions and acknowledges exclusive tribal jurisdiction over actions involving Indian children who reside or are domiciled within the tribe's reservation and over cases involving Indian children who are wards of tribal courts regardless of residence or domicile. Here, the Tribe does not assert exclusive jurisdiction under § 1911(a) as the children have never resided or been domiciled within the Tribe's reservation, nor are they a ward of the Tribe's court.

[4] The second jurisdictional component of ICWA, § 1911(b), concerns transfer proceedings. It addresses two of the four categories of actions involving Indian children by acknowledging concurrent but presumptively tribal jurisdiction over foster care placement and termination-of-parental-rights actions. *See Holyfield*, 490 U.S. at 36. Section 1911(b) states:

> In any State court proceeding for the *foster care placement of, or termination of parental rights to*, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: Provided, [t]hat such transfer shall be subject to declination by the tribal court of such tribe.

25 U.S.C. § 1911(b) (emphasis added). Thus, § 1911(b) by its terms governs only foster care placement and termination-of-parental-rights actions.

ICWA defines "foster care placement" as:

[A]ny action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, *but where parental rights have not been terminated* . . . .

6

§ 1903(1)(i)–(iv). In this case, only the latter categories are applicable: preadoptive and adoptive placements—due to the permanent termination of the mother's parental rights effective April 1, 2025.[5] The Tribe did not move for transfer and dismissal until May 20. Thus, when the Tribe requested the transfer, the action was not one for foster care placement or termination of parental rights because the court had already terminated the children's parental rights. Therefore, section 1911(b) does not govern the Tribe's motion to transfer. But even if preadoptive and adoptive placements proceed in state court, a tribe may continue to participate if, as here, it has intervened under § 1911(c).[6]

Although ICWA does not govern the transfer of preadoptive and adoptive placement actions, state courts may nonetheless transfer such cases involving Indian children to tribal courts. The 2016 Bureau of Indian Affairs Final Rule and Guidelines support this conclusion, stating the following: "Parties may request transfer of preadoptive and adoptive placement proceedings, but the standards for addressing such motions are not dictated

---

*Id.* § 1903(1)(i) (emphasis added). And ICWA defines "termination of parental rights" as "any action *resulting in the termination of the parent-child relationship.*" *Id.* § 1903(1)(ii) (emphasis added).

[5] Termination of the father's parental rights were effective December 31, 2023.

[6] Many courts have held that section 1911(c), which recognizes a tribe's right to intervene in foster care placement and termination proceedings, does not bar state courts from allowing intervention in adoption proceedings. *See In re Appeal in Maricopa Cnty. Juv. Action No. A-25525*, 667 P.2d 228, 234 (Ariz. Ct. App. 1983) ("Although [ICWA] explicitly provides a tribe with the right to intervene in foster care and termination proceedings, it does not preclude a trial court from exercising its discretion in allowing intervention by a tribe in an adoption proceeding." (citation omitted)); *In re Baby Boy C.*, 805 N.Y.S.2d 313, 329 (App. Div. 2005) ("Many courts have held that although ICWA does not provide a statutory right of intervention, neither does it prohibit intervention under applicable state law.").

by ICWA or these regulations." *See* Bureau of Indian Affairs, Response to Comment on Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778, 38822 (June 14, 2016); Off. of the Assistant Sec'—Indian Affs., U.S. Dep't of Interior, *Guidelines for Implementing the Indian Child Welfare Act* 47 (2016); *see also In re M.S.*, 237 P.3d 161, 166 (Okla. 2010) ("[W]e cannot construe § 1911(b), as a matter of law, as an expression of intent to preclude tribal court jurisdiction when transfer is requested after parental rights are terminated."); *but see In re R.S.*, 805 N.W.2d 44, 49–50, 55–56 (Minn. 2011) (concluding that federal and state law did not authorize transfer of a state preadoptive action).

In examining the juvenile court's decision to deny the Tribe's motion to transfer jurisdiction under federal ICWA, it is essential to consider the distinction between child custody proceedings and post-termination preadoption proceedings. For example, in *Gila River Indian Community v. Department of Child Safety*, the Arizona Supreme Court clarified that the federal ICWA does not apply to proceedings that occur after parental rights have been terminated and before adoption, as these are not considered child custody proceedings under the Act. 395 P.3d 286, 291 (Ariz. 2017).

The present case falls squarely within this post-termination pre-adoption phase. Parental rights have already been terminated, and the proceedings are focused on the placement of the children for adoption. As such, the statutory mandate for transferring jurisdiction to the tribal court under federal ICWA does not apply, and we cannot say that the district court erred in concluding the same. But, unlike Arizona, our inquiry does not end there. Because Iowa has its own codified version of ICWA, we must next address its implications.

8

## II.    State ICWA

"Iowa passed the Iowa Indian Child Welfare Act in 2003 to 'clarify state policies and procedures regarding implementation' of the federal ICWA." *In re T.F.*, 972 N.W.2d 1, 11 (Iowa 2022) (quoting Iowa Code § 232B.2).

The Iowa ICWA provides:

> Unless either of an Indian child's parents objects, in any *child custody proceeding* involving an Indian child who is not domiciled or residing within the jurisdiction of the Indian child's tribe, the court shall transfer the proceeding to the jurisdiction of the Indian child's tribe, upon the petition of the following persons:
>
> a. Either of the child's parents.
>
> b. The child's Indian custodian.
>
> c. The child's tribe.

Iowa Code § 232B.5(10) (emphasis added).

> If a petition to transfer proceedings as described in subsection 10 is filed, the court shall find good cause to deny the petition only if one or more of the following circumstances are shown to exist:
>
> a. The tribal court of the child's tribe declines the transfer of jurisdiction.
>
> b. The tribal court does not have subject matter jurisdiction under the laws of the tribe or federal law.
>
> c. Circumstances exist in which the evidence necessary to decide the case cannot be presented in the tribal court without undue hardship to the parties or the witnesses, and the tribal court is unable to mitigate the hardship by making arrangements to receive and consider the evidence or testimony by use of remote communication, by hearing the evidence or testimony at a location convenient to the parties or witnesses, or by use of other means permitted in the tribal court's rules of evidence or discovery.

*Id.* § 232B.5(13).

The first step to our analysis is not a consideration of what constitutes "good cause" but rather, what is a "child custody proceeding."

Iowa Code section 232B.3(3) states:

> "Child custody proceeding" means a voluntary or involuntary proceeding that may result in an Indian child's adoptive placement, foster care placement, preadoptive placement, or termination of parental rights.

Indeed, the federal counterpart likewise gives similar definition to "child custody proceeding":

> For the purposes of this chapter, except as may be specifically provided otherwise, the term—
>
> (1) "child custody proceeding" shall mean and include—
>
> (i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
>
> (ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
>
> (iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
>
> (iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

25 U.S.C. § 1903(1). The difference, however, is how "good cause" interplays with the different categories of placement. Specifically, unlike its

federal counterpart, Iowa ICWA's good-cause clause found in section 232B.5(13) applies to all categories of placement— "Indian child's adoptive placement, foster care placement, preadoptive placement, or termination of parental rights." *See* Iowa Code § 232B.3(3). And in this case, the children are in a post-termination preadoptive placement. Thus, the State is correct that transfer is required—without regard to the children's best interests[7]—unless good cause is shown otherwise.

And good cause here is confined to circumstances in which the evidence necessary to decide the case "cannot be presented in the tribal court without undue hardship to the parties or the witnesses . . . ." *Id.* § 232B.5(13)(c). Relative to that analysis, the juvenile court stated:

> The Tribe had notice of these proceedings for several years, but did not formally intervene until May 6, 2025, after termination of parental rights had been entered for both parents. The State has been involved with the children since 2022 and handled complicated matters in the numerous cases involving the children that have culminated into three years of litigations during both Child in Need of Assistance [(CINA)] and two Termination proceedings. The issue of placement was raised in the fall of 2024, and parties were in the middle of a contested hearing when the Tribe decided to intervene and request transfer. The Tribe is located approximately 460 miles (a 7-hour and 14-minute drive) from the children's current residence in West Des Moines, Iowa. *See In re J.R.H.*, 358 N.W.2d [311,] 314 [(Iowa 1984)](finding undue hardship existed to

---

[7] To support its argument the State cites to *T.F.* for its narrow reading of "good cause." 972 N.W.2d at 17. And *T.F.*—in part—cites to *N.V.* for its understanding of "good cause." *Id.* at 16. In *N.V.*, our supreme court recognized that Iowa Code section 232B.5(10) and (13) does not provide for a best-interests exception to transfer. 744 N.W.2d at 637–38. Moreover, the *N.V.* court recognized that the Iowa ICWA does not consider the best interests of the child in the traditional sense. *See id.* at 638. Instead, the court declared in *N.V.* that "it is in a child's best interest to place him or her in a home that will preserve the unique values of the child's tribal culture and assist the child in establishing relationships with the tribe and tribal community." *Id.* at 638–39.

deny transfer to tribal court when children were located in Iowa and the tribe was located in South Dakota). *Cf. . . . T.F.*, 972 N.W.2d at 17 (finding no undue hardship when the tribal court was located 170 miles or 2 hours away from the parties). At the time of the Tribe's motion, the children had never visited the reservation, and no tribal member had ever made an effort to meet the children. The children have no connection to any tribal member, other than their biological father who had a very limited relationship with the children. The Court currently serves as guardian of the minor children. All parties, witnesses and evidence involving the cases are located in Iowa. Transfer would require the District Court's participation in proceedings before the Rosebud Sioux Tribal Court. During the hearing, tribal witnesses, Ms. Bad Wound and Ms. Whipple, were unable to fully articulate how the matter would proceed in tribal court if transferred. While the Tribe offered that remote proceedings would be readily available, the Court has serious concerns regarding the feasibility of remote participation given hearings during both the CINA and Termination proceedings had to be repeatedly rescheduled due to issues coordinating with the Tribe via remote communications—significantly delaying proceedings in the cases. Ms. Whipple could confirm the intervenors would be able to participate in the proceedings. If able to do so, it would require the [placement family] to hire an attorney who is licensed to practice for the Tribe. When asked to explain the request for transfer, the Tribe merely asserted its entitlement to do so, offering no meaningful explanation for the request at this stage in the proceedings. Moreover, as of the time of the hearing, the Tribe has made only minimal efforts to identify or connect the children with extended family or tribal resources, citing limited resources and staffing constraints. Under these circumstances, the Court concludes that undue hardship would result from a transfer to the tribal court and good cause exists to deny the transfer.

Upon our de novo review of the record, we disagree with the juvenile court's findings relative to undue hardship. The juvenile court cited a number of concerns, many of which had bearing on the children's best interests—not on the undue hardship of a jurisdictional transfer. Yet our supreme court in *T.F.* held that ICWA transfer decisions are purely jurisdictional determinations focused on forum convenience, not substantive

best-interests inquiries, and that the best interests of the children have no bearing on this jurisdictional threshold. 972 N.W.2d at 16–17.

Denita Whipple, the chief clerk of court for the Tribe for the past twenty-eight years, testified that the Children's Tribal Court operates with a dedicated clerk responsible for issuing notices and coordinating remote participation. According to Whipple, that clerk routinely sends notices and arranges Zoom access for attorneys and parties who appear remotely, and the court has continued to use such technology following its initial adoption during the COVID-19 pandemic. This testimony establishes that the Children's Tribal Court possesses the administrative capacity to conduct proceedings with remote participation when necessary.

Here the Tribe's representative appeared at both transfer hearings by Zoom, and that remote appearance created little to no difficulty for the parties or the district court. Moreover, the Tribe's chief clerk of court established the Tribe's ability to conduct remote proceedings, and thus its ability to "mitigate the hardship by making arrangements to receive and consider the evidence or testimony by use of remote communication." Iowa Code § 232B.5(13)(c). Because paragraph (c)'s exception to mandatory transfer does not apply, the juvenile court was required to transfer jurisdiction to the Tribe.

**REVERSED AND REMANDED.**